**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**John William MARTIN,
Defendant-Appellant.**

No. 82–1171.

United States Court of Appeals,
Sixth Circuit.

Argued Nov. 2, 1982.

Decided Jan. 3, 1983.

Certiorari Denied April 4, 1983.
See 103 S.Ct. 1532.

William L. Woodard, Miriam L. Siefer, Darwyn P. Fair (argued), Deputy Federal Defenders, Detroit, Mich., for defendant-appellant.

Leonard R. Gilman, U.S. Atty., Marcia A. Cooke (argued), Detroit, Mich., for plaintiff-appellee.

Before JONES and CONTIE, Circuit Judges, and PECK, Senior Circuit Judge.

CONTIE, Circuit Judge.

John Martin, Sr. appeals his conviction for bringing in and harboring aliens as prohibited by 8 U.S.C. § 1324(a)(4). Appellant was sentenced to eighteen months in prison. The sole issue before this court is whether Martin was denied a fair trial when the prosecutor commented during closing argument upon the absence of two potential defense witnesses. For the reasons set forth below, we affirm the conviction.

The government's case depended primarily upon the testimony of two Jamaican citizens, Mr. and Mrs. Samuel Thomas. The Thomases unsuccessfully attempted to enter the United States by ferry boat from Bob-Lo Island, a Canadian amusement park located near Detroit, Michigan. The Thomases testified that they entered Canada on visitors' visas but stayed beyond the three-

week limit. Both sought and obtained work in Toronto, Canada. In August, 1980, Mr. Thomas was laid off and Mrs. Thomas was unable to work because of pregnancy.

Mr. Thomas testified that he met a man named "John" at a party. John said he knew another man who could help the Thomases enter the United States but that the aid would cost $2,000. On August 30, 1980, the Thomases brought the money to a parking lot in Toronto where John introduced Mr. Thomas to the appellant, John Martin. After the money exchanged hands,[1] the Thomases were told to take a train to Windsor, Canada where Martin would meet them.

Both Mr. and Mrs. Thomas testified that after Martin found them at the Windsor train station, he took them to a hotel and left for the night. In the morning, August 31, 1980, he returned with tickets for a boat trip from Bob-Lo Island to Detroit. Alicia Dismukes, who accompanied Martin and the Thomases to Bob-Lo Island that morning, testified that Martin had instructed her to buy the tickets in Detroit the previous night.[2]

The Thomases further testified that they, Martin, Dismukes, and another couple then went to Bob-Lo Island by boat. When the Thomases attempted to board the Detroit ferry several hours later, United States Immigration and Naturalization Service (INS) officials stopped them and placed them in a temporary detention area. Mrs. Thomas testified that she convinced a Bob-Lo employee to allow her to use the restroom. She left the detention area without permission and sought out Martin. INS officials found Martin, Mrs. Thomas and Dismukes conversing together shortly thereafter. After an ensuing investigation and after Martin returned to the United States, he was indicted in one count for illegally bringing in and harboring aliens. The Thomases were granted immunity in return for testi-

fying that Martin had aided their attempt to enter the United States and had specifically instructed them to board the Detroit-bound ferry.

Martin's story differed substantially from the Thomases. He testified that he was in Toronto visiting two friends, Miriam and Barry. When Martin received word that his wife had given birth sooner than expected, he went to the Toronto train station in order to try to arrange his return to Detroit. There he met the Thomases by chance and gratuitously promised to pick them up in Windsor. Martin went back to Miriam's home for a short time and then returned to Windsor by airplane. Upon arrival, he found the Thomases at the train station, drove them to a hotel and went to the hospital to see his wife. The next morning he and Dismukes drove the Thomases to the dock where they boarded a boat for Bob-Lo. Though the Thomases left Martin and Dismukes after reaching the island, Mrs. Thomas later approached in hysterics. She claimed that the authorities had detained her husband and she asked Martin to help her flee the island. When an INS official found the three, Martin claimed that he had been tricked into bringing the Thomases to Bob-Lo and that he knew nothing about their illegal scheme.

The first mention of Miriam and Barry occurred during the direct examination of Martin. During closing argument, the prosecutor made the following statement without first seeking permission from the trial judge:

Mr. Martin testifies that he has close friends in the Toronto area and that he visits them often. He testifies that he visited Miriam and Barry, and that he's even talked to them since this instance. And I assume that they may have even talked quite often, the Government doesn't know that. But Miriam and Bar-

---

1. Mr. Thomas testified that Martin and "John" divided the money, although the record does not reflect how much each received.

2. The only place where one could purchase tickets from Bob-Lo Island to Detroit was in

Detroit itself. Consequently, in order for the Thomases to have possessed Detroit-bound tickets, someone must have purchased the tickets for them. Dismukes testified that she bought the tickets pursuant to Martin's orders.

ry know what happened. Maybe Miriam and Barry could explain the same things that Mr. Martin explained to us.

The trial judge sustained an objection to this argument and told the jury to disregard it. The jury later received a general instruction that Martin had no duty to call witnesses or to present evidence. Martin contends that the prosecutor's remark requires that the conviction be vacated and a new trial ordered.

■ Appellant argues that the prosecutor's remark invited the jury to infer that had Miriam and Barry been called, their testimony would have been unfavorable to Martin. When the government wishes to request the jury to draw an inference adverse to the defendant because potential defense witnesses have not testified, the government must obtain an advance ruling. *United States v. Beeler,* 587 F.2d 340, 343 (6th Cir.1978), *cert. denied,* 454 U.S. 860, 102 S.Ct. 315, 70 L.Ed.2d 158 (1981); *United States v. Blakemore,* 489 F.2d 193, 196 (6th Cir.1973). The prosecutor did not seek such a ruling. Moreover, Martin asserts that had the government sought permission, the trial court would have denied the request. The *Blakemore* test, which controls whether a prosecutor may ask the jury to draw an adverse inference when defense witnesses have not appeared, allegedly would not have been satisfied. Thus, the trial judge arguably committed reversible error.

■ We disagree. First, the remark in question did not invite the jury to infer that the testimony of Miriam and Barry would have been unfavorable to Martin. *Blakemore* and *Beeler* are distinguishable. In *Blakemore,* the defense did not call four potential witnesses. The prosecutor, unlike the present case, specifically requested the jury to draw an adverse inference:

> The fact that [the four witnesses] were not called would permit you to draw an inference that their testimony . . . was unfavorable to the defendant and that is the reason they were not called. [489 F.2d at 195.]

In *Beeler,* the prosecutor forcefully argued that uncalled witnesses would not have cor-

roborated defendant's testimony. The prosecutor made no such comment here. While a strong implication, rather than a direct request, could under some circumstances invite the jury to draw an adverse inference, the remark in question does not rise to that level. Since the prosecutor did not suggest that the jury draw an adverse inference, *Blakemore* and *Beeler* are inapposite.

■ Secondly, even if the prosecutor's comment invited an adverse inference, the *Blakemore* test is satisfied in this case. For the government's argument to be proper under *Blakemore,* the witnesses must have been peculiarly within appellant's power to produce and their testimony must have been such as would have elucidated the transaction. 489 F.2d at 195–96.

■ Martin contends that since the subpoena powers of the federal courts do not extend into Canada, Miriam and Barry were not peculiarly within either party's power to produce. This argument completely misconstrues *Blakemore.* In that case, this court held:

> "Availability" of a witness to a party must take into account both practical and physical considerations [citation omitted]. Thus whether a person is to be regarded as peculiarly within the control of one party may depend as much on his *relationship* to that party as on his physical availability. [489 F.2d at 195 (emphasis supplied).]

In a footnote, the court noted that numerous legal, personal or social relationships could in a practical sense make a witness' testimony available to only one party. 489 F.2d at 195 n. 4. Consequently, whether Martin could have subpoenaed the witnesses is not dispositive. *United States v. Lehman,* 613 F.2d 130, 136 (5th Cir.1980). His ongoing friendship with Miriam and Barry establishes a sufficient relationship upon which to conclude that the witnesses were peculiarly within his power to produce.

The witnesses' testimony also would have elucidated the transaction in question. The government's theory at trial was that Martin went to Toronto for the purpose of

meeting the Thomases. Once there, Martin directed the couple to travel to Windsor, from where the latter would attempt to enter the United States illegally. Since Miriam and Barry would, according to appellant, have testified that Martin had a legitimate reason for being in Toronto and that he never went to the parking lot, their testimony would have contradicted the government's account. This important evidence obviously would have elucidated the transaction.

We therefore hold that even if the prosecutor's remark invited the jury to draw an inference adverse to Martin, a request for an advance ruling, had it been made, should have been granted inasmuch as the *Blakemore* test was satisfied. Although the better practice is to seek an advance ruling, the prosecutor's failure to do so in this case was harmless error.

Accordingly, the judgment of the district court is AFFIRMED.