**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Vito SBLENDORIO, Wesley Yong, Jaroslav Herda, Jason Smith, Nancie Cohen, Pamela Wolley, Bobby Peterson, Morton Goldsmith, and Jopha Campbell, Defendants-Appellants.**

Nos. 86–1549, 86–1550, 86–1577 to 86–1581, 86–1600 and 86–1696.

United States Court of Appeals, Seventh Circuit.

Argued June 3, 1987.

Decided Sept. 8, 1987.

there has been no showing that plaintiff suffered cognizable injury." *Id.*

Kent R. Carlson, Chicago, Ill., for defendants-appellants.

Laurie Feldman, Asst. U.S. Atty., and Anton R. Valukas, U.S. Atty., Chicago, Ill., for plaintiff-appellee.

Before EASTERBROOK and RIPPLE, Circuit Judges, and GRANT, Senior District Judge.[*]

EASTERBROOK, Circuit Judge.

Morton Goldsmith was the head of a chain of clinics and pharmacies, many flying the banner of Drug Industry Consultants, Inc. (DIC). Between 1981 and 1984 DIC's clinics and pharmacies, and those of associated enterprises, prescribed and sold large quantities of codeine-based cough syrups to addicts. The clinics were selective. To be a patient, you had to have a Medicaid card. Not necessarily yours; anyone's would do. The Medicaid card was the key to DIC's profits.

I

Someone with a Medicaid card who visited a clinic would have some blood drawn for analysis in a laboratory associated with DIC; the bill would be sent to Illinois for reimbursement under the Medicaid program (jointly funded by state and federal governments). Blood would be collected no matter what the visitor's reported ailment. The tests often were not performed; if the tests were performed, the results often were thrown away. Visitors to some clinics had to submit to breath (spirometric) tests. These were hastily performed, submitted to unqualified physicians for analysis, and thereafter ignored—even when the physician's analysis indicated problems requiring medical attention. They were

[*] The Honorable Robert A. Grant, of the Northern District of Indiana, sitting by designation.

billed to the state just the same. (There is testimony, however, that some persons with obvious medical problems who entered a clinic by mistake, thinking it a place to get care, were sent elsewhere.)

The tests were sideshows. The main event was the prescription to satisfy the drug habits of the clientele. Physicians at DIC's clinics prescribed codeine-based cough syrups to more than 90% of all visitors. Some physicians would prescribe anything the customer wanted; others asked for a verbal report of an ailment ("I have a cold"). Medicaid would not pay for these syrups. To generate profits, the clinics regularly prescribed other drugs (such as antibiotics) for which Medicaid would pay. The customers presented their prescriptions, paying only for the cough syrup. Often the customers threw the other items away in the pharmacy or immediately outside; some of the pharmacies simply did not fill the non-narcotic parts of the prescription; whether the customers saw the extra drugs or not, Illinois got the bill. During their operation, DIC and associated enterprises collected more than $19 million from Illinois and an unknown (but large) amount directly from the customers.

Both customers and physicians floated from one clinic to another. Some customers visited a DIC clinic daily. Some physicians were themselves drugged, with the assistance of pharmacies told to give the doctor whatever he ordered. The more stupefied the doctor, the more pliable in carrying out DIC's instructions.

The 149–count indictment charged 36 of the participants with a variety of offenses. Twenty-five of the defendants pleaded guilty or were dismissed; eleven stood trial and were convicted; nine of the eleven have appealed. The most serious charge, leveled against Goldsmith and Vito Sblendorio, is running a continuing criminal enterprise (CCE), in violation of 21 U.S.C. § 848. Both were convicted. All appellants were convicted of conspiring to violate 18 U.S.C. § 1962(c) and (d), part of the Racketeer Influenced and Corrupt Organizations Act (RICO), and of substantive violations of RICO. The RICO offense is operating an enterprise through a pattern of criminal offenses. The "enterprise" was DIC and affiliates; the "pattern" comprised mail fraud, obstruction of justice, and distribution of narcotics. The 84 counts of mail fraud, 18 U.S.C. § 1341, dealt with causing Medicaid checks to be mailed to pay for DIC's billings, and the "fraud" was that the bills were for goods and services that were not medically necessary, sometimes not even rendered. The 58 counts of unlawful distribution, 21 U.S.C. §§ 821–43, arose out of dispensing codeine-based drugs and sedatives that were not medically indicated. Goldsmith and Nancie Cohen (his factotum at DIC) were convicted of a single count of obstruction of justice, 18 U.S.C. § 1503, for failing to produce DIC's business records in response to subpoenas. Goldsmith and Cohen also were convicted of separate counts of perjury, 18 U.S.C. § 1623, for lying to the grand jury about their access to, and disposition of, DIC's business records.

The jury found most defendants guilty on most counts, although there were many acquittals (and on count 91 the jury returned both verdicts). Goldsmith received the highest sentence: 12 years' imprisonment and a $150,000 fine. Sblendorio, a pharmacist who ran several of the pharmacies and clinics under both DIC and an independent organization, was convicted of CCE, mail fraud, and distribution, and received 10 years' imprisonment. The other appellants received lighter punishments, though at least one year in jail.

Seven of the nine contend that the evidence is insufficient with respect to at least one of the convictions. Some of these arguments point out genuine weaknesses in the government's case. Jopha Campbell, for example, was a physician employed by Mid-City Health Center, a clinic owned by Dorothy Oltean. Called the Catherine Health Center (with the Cherry Pharmacy next door—DIC's enterprises shared common first initials) while DIC owned it, Mid-City was sold to Oltean, who had been a cashier or receptionist operator at Cherry. The prosecution maintains that the sale was an effort to mislead Illinois welfare officials about the clinic's beneficial owner-

ship after Illinois stopped reimbursing DIC and made it hard for DIC's pharmacies to obtain codeine-based drugs. Campbell believes that Oltean's ownership shows that Mid-City was not part of the DIC "enterprise" for purposes of RICO. The prosecution replies that the transfer was formal, that Oltean paid off DIC's debts and also paid "rent" to DIC for the premises, which the prosecution describes as a euphemism for passing the profits to DIC.

Other examples: Jason Smith points out that he did not prescribe codeine for an undercover agent on the agent's first visit and contends that he prescribed it on a second visit only after concluding that it was medically indicated. The prosecution responds that Dr. Smith charged the agent $5 extra for including a codeine syrup in the prescription and then prescribed many unnecessary items (including condoms!) to run up the Medicaid bill. The government observes that Dr. Smith's records show that he wrote prescriptions for codeine syrups to more than 95% of his "patients". Goldsmith and Cohen contest their perjury and obstruction of justice convictions, saying that DIC really did not have the documents; the prosecution replies that DIC produced some of the documents in a hurry when one of its former employees said he needed them to defend himself, which supports an inference that DIC had them squirreled away somewhere or destroyed them at the last minute. There are many more controversies about the evidence.

Disputes of this nature are fodder for juries. Our inquiry is whether any rational trier of fact, taking the evidence and all legitimate inferences in the prosecution's favor, could have thought the facts sufficient to show guilt beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *United States v. Fakhoury*, 819 F.2d 1415, 1418 (7th Cir.1987). The evidence is sufficient on each of the counts the defendants now contest.

We also conclude that the district judge did not abuse his discretion in admitting some evidence over the defendants' objection. The evidence was relevant to the defendants' knowledge of the type of operations these clinics and pharmacies were conducting, and the judge made a reasoned decision under Fed.R.Evid. 403 that the legitimate uses of the evidence outweighed its potential for improper prejudice.

## II

At the conclusion of this lengthy trial, the jury had to consider hundreds of criminal charges. There were "only" 149 counts in the indictment, but most counts charged different combinations of defendants, and the jury had to consider each defendant separately under each count. After deliberating for less than three hours, the jury sent the court a note stating that one juror believed the evidence insufficient concerning every defendant and every count. The foreman's note concluded: "We don't know whether this would result in a hung jury or an acquittal for the body of defendants. I am appealing to you because I really don't know what to do about this particular juror."

"What to do about" a potentially deadlocked jury in this circuit was established by *United States v. Silvern*, 484 F.2d 879, 883 (7th Cir.1973) (en banc). Using the court's supervisory powers, see *Young v. United States ex rel. Vuitton et Fils S.A.*, — U.S. —, 107 S.Ct. 2124, 2135–38, 95 L.Ed.2d 740 (1987), *Silvern* prescribed an instruction, which may be given to a hung jury only if given during the initial charge too. The instruction adds several cautions to the traditional "dynamite charge" based on *Allen v. United States*, 164 U.S. 492, 501–02, 17 S.Ct. 154, 157, 41 L.Ed. 528 (1896). The *Silvern* instruction is (484 F.2d at 883):

> The verdict must represent the considered judgment of each juror. In order to return a verdict, it is necessary that each juror agree thereto. Your verdict must be unanimous.
>
> It is your duty, as jurors, to consult with one another and to deliberate with a view to reaching an agreement, if you can do so without violence to individual judgment. Each of you must decide the case for yourself, but do so only after an

impartial consideration of the evidence with your fellow jurors. In the course of your deliberations, do not hesitate to re-examine your own views and change your opinion if convinced it is erroneous. But do not surrender your honest conviction as to the weight or effect of evidence solely because of the opinion of your fellow jurors, or for the mere purpose of returning a verdict.

You are not partisans. You are judges—judges of the facts. Your sole interest is to ascertain the truth from the evidence in the case.

This language is designed to ensure that no juror feels compelled to surrender a belief conscientiously held after time for reflection. The court concluded (484 F.2d at 883 & n. 7): "unless and until we suggest any further change in the future, the instruction quoted in this opinion is the only deadlock instruction to be given. If in any jury trial tried after thirty (30) days from this opinion a supplemental instruction relating to a deadlock is given other than in the above form, a resulting conviction will be reversed and remanded for a new trial." For 14 years the court has reversed every conviction in which a deadlock instruction other than the *Silvern* instruction was given.

The district judge did not give the *Silvern* instruction. After consulting with counsel, the court gave an instruction dealing with the predicament of this jury, at this time. The instruction included some information (such as the fact that "[a]nything short of 12 votes for either guilty or not guilty is no verdict") and some advice (such as: "The notion of taking a sweeping, all-encompassing position on the indictment as a whole so early in the deliberations may be one that will not hold up under further scrutiny."). After delivering the supplemental instruction, the court sent the jurors home for the day. The jury later deliberated for more than a week, returning the convictions we have described and 56 verdicts of not guilty.

The instruction as a whole was designed both to inform the jury of the effect of lack of unanimity and to cajole the juror in

question to think about the evidence separately on each of the charges. None of the lawyers for the nine defendants who prosecute these appeals asked the court to give the *Silvern* instruction. That charge is designed for a jury that has deliberated at length and believes it cannot continue. A *Silvern* charge in this case might have left the jurors baffled. They asked specific questions; the abstruse *Silvern* charge does not provide clear answers.

In a brief opinion, the district judge explained his decision not to give the *Silvern* charge:

Because this court is aware of the attitude of the Seventh Circuit concerning the *Silvern* instruction, it is appropriate to make clear just why it was not given in this case. The trial had lasted more than eight weeks. The daily sessions had been long. Counsel on both sides were mentally and physically fatigued. None of the defendants had any reason to believe that his or her chances for acquittal would be any better after a second trial. The defendants themselves were anxious to bring the case to a conclusion. Ordinarily, when a jury indicates an inability to agree, no matter how early in its deliberations, the defendants will move for a mistrial and object to even the *Silvern* instruction being given, let alone any instruction other than *Silvern*. The reason defendants usually move for a mistrial in those situations is that they would rather face a second trial than take a chance on a favorable verdict in the first trial. Here, each of the defendants wanted a verdict, not a new trial. The evidence varied considerably as to the eleven defendants, and no defendant believed that his or her chances for acquittal were nil.... The instruction actually given does not appear to have been coercive in any degree.... Nor do I see any error in answering the foreman's specific question as to the effect of a failure to agree. The answer was accurate and neutral. Surely the defendants did not have a right to have the jury labor under a misapprehension as to what the law was.

Were it not for the inflexible language of *Silvern*, this would be an easy case. The court gave an instruction suited to the occasion. But *Silvern* does not admit of exceptions. The court tried in *Silvern* to end what had been an extended debate about whether this or that variation on the *Allen* charge (or one of the many suggested model charges proposed by the ABA and compilers of pattern jury instructions) was satisfactory. Before *Silvern*, there had been a parade of cases requiring detailed scrutiny by the court of appeals—and a lot of home-brewed psychology, as judges tried to figure out what effect an instruction would have on the jurors in the particular trial. *Silvern* ended all that. The price was inflexibility, some mismatch between the instruction and the case. The district judge decided that the mismatch was too much to bear in this case. Perhaps so, but if this mismatch was too striking, does it follow that we must assess other deviations one case at a time? If so, we are back to the world as it was before *Silvern*.

 Therefore we are troubled by the instruction the court gave, although we do not foreclose the possibility that a similar instruction might be approved in the future. We need not deal with the propriety of this variation, because counsel did not ask the court to give the *Silvern* instruction. All counsel participated in drafting a special instruction. Even if the result was a mistake, it was not plain error under Fed.R.Crim.P. 52(b). To be "plain error", a miscue must not only violate an established legal rule but also produce a miscarriage of justice. *United States v. Lewis*, 797 F.2d 358, 369 (7th Cir.1986). See also *United States v. Young*, 470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985); *United States v. Frady*, 456 U.S. 152, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982).

 Clarity (in retrospect) does not make the error "plain" for that would imply that every bright-line rule is enforced by automatic reversal. Rule 52(b) requires more than *clear* error; the error must be prejudicial in the sense that it undermines confidence in the outcome of the trial. *United*

*States v. Silverstein*, 732 F.2d 1338, 1349 (7th Cir.1984). If the district judge was mistaken in departing from *Silvern*, the error did not create a significant chance of convicting the innocent. Deviation from a "supervisory" rule—a rule established in the interest of the effective administration of justice—could be "plain error" only in an extraordinary case. It may be that a supervisory rule devised as an alternative to a constitutional holding should be enforced more vigorously; in *Vuitton* four Justices took the position that failure to anticipate a newly created supervisory rule could not be "harmless" error. 107 S.Ct. at 2138–41 (Brennan, Marshall, Blackmun & Stevens, JJ.). That case had constitutional overtones in a way *Silvern* did not, because *Allen* upheld a sterner deadlock instruction. And at all events any error here must be "plain" as well as "harmful".

*Silvern* was designed to eliminate enervating litigation, in the district court and on appeal, about the wisdom of ringing small changes on the theme of the dynamite charge. The court did not suggest that a change endangers the reliability of the verdict; to the contrary, it conceded (484 F.2d at 883 n. 7) that variations are acceptable in principle. The court ruled out these variations to produce effective judicial administration rather than to guarantee the fundamental rights of criminal defendants. Rules that protect the judicial system do not invariably furnish rights to defendants; the principle of Rule 52(a) and 28 U.S.C. § 2111, that errors not affecting substantial rights of the parties shall be disregarded, cuts the other way. See *United States v. Murphy*, 768 F.2d 1518, 1539–40 (7th Cir.1985); *Walton v. United Consumers Club, Inc.*, 786 F.2d 303, 313–14 (7th Cir. 1986). That appellate judges object to spending time unnecessarily chasing psychological shadows does not imply that a district judge, nine defendants, nine defense lawyers, a bevy of witnesses, and a team of prosecutors must spend another ten weeks retrying this case—creating the occasion for who knows how many additional errors to creep in, for any long trial will contain some mistakes. New trials may be no better overall, and the evidence

will be older. Second trials also postpone the day in court for other people waiting for their first trials. We know that *this* trial was well run and afforded defendants all of their procedural rights. That is enough. *Silvern* does not govern this case. We do not retreat from *Silvern* and will enforce it without question in those cases to which it applies.

Although the defendants did not preserve a request for the *Silvern* instruction, they did object to one portion of the instruction the court gave. To put the statement in context, we present the portion of the instruction that answered the jury's question about the effects of a holdout among them:

> The verdict of a jury must be unanimous; that is, for any verdict to be reached on any count as to any defendant, there must be unanimous concurrence of all 12 jurors that that defendant is either guilty or not guilty on that count. Anything short of 12 votes for either guilty or not guilty is no verdict.
>
> That is what is known as a hung jury. That is not an acquittal.
>
> What happens in the case of a hung jury is that the case must be retried before a different jury.
>
> I urge you, ladies and gentlemen, in view of the truly impressive amount of time that has been devoted to the trial of this case, to return to your deliberations and attempt to reach a verdict or verdicts as to as many defendants and as to as many counts as you can based upon the evidence and based upon the instructions of law I have given you.

The defendants objected to the statement that if the jury cannot reach agreement, "the case must be retried before a different jury." They observe that "must" is too strong; there is no legal compulsion to retry; and, they say, perhaps this observation induced the jury to agree simply to avoid the delay and travail of another trial. ■ Concerns of this sort were voiced frequently in this circuit before *Silvern*, and they have led many courts to insist on "balancing elements" in a deadlock instruction. Because supplementary instructions create a danger that jurors will cave in just to get things over with, the judge should include a reminder that notwithstanding the cost of trial, each juror must reach an independent decision—though one informed by deliberation. This is a substantial concern in many cases, but in ours a phantom. The judge was not trying to get the last holdout to knuckle under. Deliberations had barely begun; the jury could not have discussed the vast majority of the counts and defendants. The instruction was designed to get one juror to join the deliberations. Answering the jury's question about what happens if they cannot agree may have been essential to that end. And the difference between "must be retried" and "probably will be retried" is not large. No one believes that the prosecution would have dropped this case if a maverick juror had refused to vote to convict anyone of anything. Letting the jury know the truth facilitates the deliberative process. The alternative is to allow the jurors to be guided by what they remember from TV shows and other sources less accurate than this instruction. Although we do not sneeze at the possibility that a reminder about a retrial could have an unwelcome effect in some cases, it could not have had such an effect here. What followed from this instruction was what should have happened at the beginning: serious, extended deliberations. The instruction produced that to which both sides were entitled, and we will not fly-speck its language.

■ Over the next week the jury asked many additional questions. Yong complains about the answer to one of these, which inquired about the date on which Yong was arrested. The judge gave an answer that turned out to be wrong, though the answer had been based on the recollection of counsel for both sides. Yong contends that this answer entitles him to a new trial. To the extent this contention is based on the jury's worksheets, it is precluded by Fed.R.Evid. 606(b). A court will not inquire into the jury's deliberative process in the absence of a claim of external influence. See *Tanner v. United States,* — U.S. —, 107 S.Ct.

2739, 2745–51, 97 L.Ed.2d 90 (1987); *Rushen v. Spain*, 464 U.S. 114, 121 n. 5, 104 S.Ct. 453, 457 n. 5, 78 L.Ed.2d 267 (1983); *Hyde v. United States*, 225 U.S. 347, 383–84, 32 S.Ct. 793, 808, 56 L.Ed. 1114 (1912); *United States v. Schwartz*, 787 F.2d 257, 261–62 (7th Cir.1986). To the extent this contention is based on the capacity of the answer to mislead the jury, it is unfounded. The date of Yong's arrest had nothing to do with his guilt or innocence. As it turned out, the answer could not have mattered even if the jury had mistakenly believed that the date of arrest was significant. Yong's only substantive conviction dealt with a prescription more than two months before his arrest. He was acquitted of a substantive count arising out of a transaction after his arrest (and initial release). The inadvertently incorrect answer to the irrelevant question did not deprive Yong of a fair trial.

### III

A long trial often ends in a long closing argument by counsel. A long, spontaneous argument creates opportunities for error; the deeper the prosecutor looks in his rhetorical kit, the more likely he is to find something that has been found (and condemned) before. The prosecutor who gave the rebuttal argument in our case talked for 122 pages of transcript and used his kit to the full. The defendants vigorously protest some of the prosecutor's remarks. Some are indefensible, but these were not met by objections. Two of the three arguments that were objected to are close to the line, but the district judge did not err in allowing the argument to continue. The third, and the one against which the defendants now direct their strongest fire, was appropriate comment. We deal with it first.

### A

Neither side calls all possible witnesses in a complex case. Why gild the lily? One party's decision not to call a potential witness may lead another to comment. If the un-called witness is under the control of the party who elects not to call him, it may be appropriate to infer that the testimony would have been favorable to the other side. *Graves v. United States*, 150 U.S. 118, 121, 14 S.Ct. 40, 41, 37 L.Ed. 1021 (1893); *United States v. Chaimson*, 760 F.2d 798, 812 (7th Cir.1985). If the witness is equally available to other parties, may anyone comment on the absence? Cases in this circuit are not easily reconciled. Some say the district judge has discretion to allow or forbid both sides to comment. E.g., *United States v. Keplinger*, 776 F.2d 678, 702–03 (7th Cir.1985). Some say the district judge must forbid anyone to comment. E.g., *United States v. Williams*, 739 F.2d 297, 299 (7th Cir.1984). Some suggest that the district judge must allow everyone to comment. E.g., *United States v. Mahone*, 537 F.2d 922, 927–28 (7th Cir.1976). These things cannot be true simultaneously.

The prosecution did not call all potential witnesses in this trial, and lawyers for some of the defendants went to town during closing argument. Counsel for one defendant made these references to Andrea Gordon, one of the bookkeepers at DIC:

Of course, Andrea Gordon. But she never surfaced once in this trial. And they [the prosecutors] looked like they wanted to put a bag over their heads every time her name came up. Because she's devastating to their case.

If what they say [about DIC] is true, why wasn't Andrea Gordon here to testify, to tell us about it? Maybe she couldn't stretch it like Bob Dubin, maybe she couldn't be so cooperative.

Another lawyer made this reference to Stuart Glantz, who according to some testimony instructed a physician to prescribe codeine-based drugs to the clinics' patients:

[T]hey never brought Mr. Glantz in. I can bet you this. If Mr. Glantz had told Dr. Fortier [to prescribe these drugs], he would have been here to testify about that, but he wasn't.

The prosecutor both replied to the point and tried to turn the tables:

You heard every defense attorney ask about, "Where is this witness, where is that witness, where is this witness?" The defendants don't have a burden, la-

dies and gentlemen. They don't have to prove anything, but they have subpoena power just like the government. I will tell you what. Mr. Tobin put on a defense for Nancy [sic] Cohen, and I will talk about that in a minute. If Nancy [sic] Cohen did not hire Carol Banks to go in and doctor these records ... you would have heard—[objection made and overruled].

You heard Mr. Steinborn testify about Nancy [sic] Cohen was going to hire one of her girls. The girl she hired, Dorothy Oltean told you, was Carol Banks. ...

If that did not happen, ladies and gentlemen, if that was not true, Carol Banks would have been here testifying that she wasn't.

All defendants now contend that the prosecutor's remarks were improper and require a new trial.

A prosecutor who comments on a defendant's failure to call a witness may mean one of three things: (1) the case stands unrebutted, which influences the weight jurors should give to the evidence; (2) each side can call witnesses, implying that neither side's failure to call a witness supports an adverse inference; (3) the defendants' failure to call the witness supports an inference that the witness would not have supported the defendants' version of events. The defendants, who complain that the prosecutor's comments here "shifted the burden of proof", apparently believe that any of these three meanings is forbidden ground.

Now none of these meanings actually changes the burden; the district judge correctly instructed the jury that the prosecutor bears the burden at all times. An inference is a way to carry the burden, and no more changes it than does damning evidence. The defendants' real complaint is that a given argument may adversely affect the exercise (or value of) a constitutional right, such as the privilege against compulsory self-incrimination. Thus the defendants' arguments about burden-shifting are offshoots of *Griffin v. California*, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965).

1. *Griffin* held that neither court nor prosecutor may invite the jury to infer guilt from the defendant's decision not to testify. They may not "solemnize[ ] the silence of the accused into evidence against him" (380 U.S. at 614, 85 S.Ct. at 1232) or "suggest[ ] to the jury that it may treat the defendant's silence as substantive evidence of guilt." *Baxter v. Palmigiano*, 425 U.S. 308, 319, 96 S.Ct. 1551, 1558, 47 L.Ed.2d 810 (1976). We have taken *Griffin* to forbid comment on the defendant's failure to call witnesses, when the only potential witness was the defendant himself. *Williams v. Lane*, 826 F.2d 654, 664–66 (7th Cir.1987); *United States ex rel. Burke v. Greer*, 756 F.2d 1295, 1300–02 (7th Cir. 1985). But unless the prosecutor's comment uses the defendant's privilege as evidence against him, it is not objectionable. A court even may call the jury's attention to the defendant's failure to testify, so long as it does not invite an inference based on the privilege. *Lakeside v. Oregon*, 435 U.S. 333, 98 S.Ct. 1091, 55 L.Ed.2d 319 (1978). Cf. *Greer v. Miller*, —— U.S. ——, 107 S.Ct. 3102, 3108–09, 97 L.Ed.2d 618 (1987).

The defendant's decisions about evidence other than his own testimony do not implicate the privilege, and a comment on the defendant's failure to call a witness does not tax the exercise of the privilege. It simply asks the jury to assess the value of the existing evidence in light of the countermeasures that were (or were not) taken. The inferences come from the evidence before the court. Arguing inferences is standard business among lawyers, which *Griffin* does not forbid. Neither do *Sandstrom v. Montana*, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979), and cognate cases, which distinguish "presumptions" (often forbidden as shifting the burden) from "inferences" (which are permissible when left to the jury's discretion). Unless the prosecutor or judge implies that the defendant's failure to testify is *itself* evidence (or a basis of an adverse inference), *Griffin* is inapplicable. The rule of *Sandstrom* does not even pertain to an argument explicitly phrased as a request

for an inference. As a result, the prosecutor may imply that the failure of the defense to present available evidence (other than the defendant's testimony) in opposition to the government's witnesses supports a conclusion that the government's witnesses are reliable. (The Supreme Court may decide next Term whether this is the correct understanding of *Griffin. United States v. Robinson,* 794 F.2d 1132 (6th Cir.1986), *cert. granted,* —— U.S. ——, 107 S.Ct. 1282, 94 L.Ed.2d 141 (1987).) The evidence must be available, for otherwise there is no support for the inference, but all agree that the witnesses not called in this case were available to both sides.

2. If the prosecution may invite attention to the lack of effective (or any) refutation of its case, it should follow that the prosecutor may reply to an argument by the defense that the absence of some witness counts against the prosecution. Thus the second possible meaning of the prosecutor's remarks—that the absence of a witness who the defendants could have called is not a good reason to discredit the prosecution's evidence—appears to be acceptable. Many of the circuits agree. E.g., *United States v. Gotchis,* 803 F.2d 74, 79–81 (2d Cir.1986); *United States v. Keller,* 512 F.2d 182, 186 (3d Cir.1975); *United States v. Ivey,* 550 F.2d 243, 243–44 (5th Cir.1977); *United States v. Perez,* 700 F.2d 1232, 1239–40 (8th Cir.1983); *United States v. Fleishman,* 684 F.2d 1329, 1343–44 (9th Cir.1982); *United States v. Merryman,* 630 F.2d 780, 788–89 (10th Cir.1980); *United States v. Esle,* 743 F.2d 1465, 1477–78 (11th Cir.1984). *Keller* and *Perez* hold that the argument is proper even if the defendant does not initiate the reference to missing witnesses. Only the First and Sixth Circuits disagree, and their position must be based on a view of *Griffin* that we reject. See *United States v. Wright,* 573 F.2d 681, 684 (1st Cir.1978); *United States v. Martin,* 696 F.2d 49, 52 (6th Cir.1983). Curiously, however, although this circuit is among those permitting the prosecutor to remark that the government's evidence is unrebutted, several panels of this court have questioned the propriety of the seemingly less potent remark that the jury

should not draw an inference in the defendant's favor from the absence of additional evidence. Other cases have held the opposite. It is instructive to trace the recent history of this divergence within the court.

■ In *United States v. Bastone,* 526 F.2d 971, 988–89 (7th Cir.1975), defense counsel used the same line of argument as in our case. The prosecutor replied that defendants could have called the witnesses if they wanted the testimony. The court stated that such replies are "approved" (at 989), citing cases back to 1962, and observed (*ibid.*) that defendants' opening the subject "necessitated a response by government counsel seeking to fairly explain the alleged weaknesses in the government's case." A few months later *Mahone,* 537 F.2d at 926–28, held that it was error to forbid the defense to argue that the prosecutor's failure to call a witness supported an inference adverse to the prosecutor, though it recognized (at 928) that this opened the door to a reply in kind. *United States v. Greschner,* 647 F.2d 740, 743 n. 6 (7th Cir.1981), citing *Mahone,* stated that so long as the witness is available to both sides, "either side should be allowed to comment on the other side's failure to produce" the witness.

There matters stood until *Williams,* which stated that unless the un-called witness is within the special control of opposing counsel, "[b]oth comment by counsel and instruction by the judge are prohibited" (739 F.2d at 297). The court drew this out of an implication in *Mahone,* which remarked that the missing witness probably was under the influence of the side against which the inference would run. Shortly after *Williams* the court decided *Chaimson,* 760 F.2d at 812, holding that a prosecutor *may* remark that a defendant could have called a witness, at least provided the prosecutor observes that both sides had access to the witness. *Chaimson* recognized that the inference is not problematic when the absent witness is aligned with the opposing side. *Williams* and *Chaimson* influenced conflicting lines of cases, which did not cite each other.

*United States v. Thomas,* 774 F.2d 807, 812 (7th Cir.1985), citing neither *Williams* nor *Chaimson,* contradicted both by saying that the prosecutor could comment on the defendant's failure to call two witnesses, even though the defendants had not sought to have the jury draw an inference against the prosecutor. *Thomas* characterized the statement as a fair comment on the evidence so long as it did not draw attention to the defendant's personal failure to testify. Contemporaneously *Keplinger,* 776 F.2d at 702–03, held that a district judge may (but need not) prevent either side from commenting, unless the missing witness was under one side's dominion. *Keplinger* recognized (776 F.2d at 703) that if one side opens the issue the other is entitled to reply and suggested that district judges prevent the subject from arising.

*United States v. Pollard,* 790 F.2d 1309, 1314 (7th Cir.1986), then held it reversible error to allow the prosecutor to point out that the defendant could have called some witnesses, after the defendant had pointed out their absence. Citing *Williams,* the panel concluded that neither side may raise the issue, and that the defendant's erroneous injection of the question does not permit the prosecutor to reply. *Pollard* treated the prosecutor's reply as shifting the burden of proof to the defense. *United States ex rel. Adkins v. Greer,* 791 F.2d 590, 598 (7th Cir.1986), simultaneously stated the opposite position. It allowed the prosecutor to comment on the defendant's failure to call witnesses, even without provocation from the defense.

*United States v. Buchbinder,* 796 F.2d 910, 919 (7th Cir.1986), and *United States v. Wheeler,* 800 F.2d 100, 106 (7th Cir. 1986), are the most recent in this sequence. *Buchbinder* says that neither side should refer to a missing witness unless the witness is under the other party's sway. *Wheeler* follows *Pollard.* The prosecutor commented that the defendant, with the right of subpoena, could have brought in any witnesses he wanted. The court treated this as a burden-shifting plea, which it

held error but assayed as harmless because the defendant had opened the door by asking the jury to draw an inference against the prosecutor.

The conflict leaves lawyers and district courts at sea. We have held (and denied) that the prosecutor's observation that the defense can call witnesses shifts the burden. We have held (and denied) that the district judge has discretion to allow such exchanges. We have held (and denied) that the effort by the defendant to secure an adverse inference opens the door to comment by the prosecutor. We cannot follow all of these cases but must choose.

The reasons leading to the conclusion that a prosecutor may comment on the unrebutted nature of the evidence show that it is appropriate to discuss missing evidence. It is not worse to say "both sides can call a witness, so don't hold the absence against us" than to say "the defendant has not produced a witness to undermine this testimony, so you should believe the live witness". These two arguments are so closely related that it is impossible to imagine permitting the latter but forbidding the former. We therefore overrule *Pollard* and *Wheeler* to the extent they forbid the prosecutor to observe that the defense could produce a witness if it wishes.[1] (We do not disturb any other feature of those cases.) The comment does not alter the burden of proof or penalize the exercise of a constitutional right. Unless the prosecutor indirectly invites an inference based on the defendant's own silence, see *Williams v. Lane,* 826 F.2d at 665, he may pursue evidentiary inferences for what they are worth. We reaffirm *Bastone, Mahone, Greschner, Thomas, Keplinger,* and *Adkins.* The prosecutor's response is not "invited error" (as *Wheeler* characterized it), cf. *United States v. Young,* 470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985), but is an accurate piece of information combined with a legitimate argument. The jury is entitled to know that the defendant may compel people to testify;

---

1. Because this opinion overrules two cases, it was circulated to all judges of this court in regular active service. See Circuit Rule 40(f).

No judge voted to rehear this case en banc on this question.

this legitimately affects the jury's assessment of the strategy and evidence.

■ We need not resolve the status of *Williams* and *Buchbinder*, which held that the judge should not allow either side to open the subject in the first place; the defendants opened it here, and only the propriety of the response is at issue. Whether or not the subject should be put off limits to the defense in the first instance, the back-and-forth about inferences from missing witnesses ordinarily "would allow the jury to speculate about the meaning of a great deal of non-evidence. We see no constructive purpose to be served by such a procedure...." *Keplinger*, 776 F.2d at 703. Unless the jury knows exactly why a party did not call a witness, it cannot fully evaluate the meaning of the witness's absence. The reasons for not calling witnesses are so many and so complex—from a desire to avoid carrying coals to Newcastle to concern about the witness's appearance and demeanor to concern about the content of the testimony to a belief that the witness would invoke the privilege against self-incrimination—that a full exploration could take the trial far afield. The traditional position, limiting comment by judge or counsel to a witness under the control of the adverse party, therefore is sound. But the administration of this principle, as of other prudential rules, is committed to the sound discretion of the district courts. The court's decision to allow the subject to be opened stands save for serious error, and once the subject has been opened the court may permit its exploration by both sides. The district court therefore was entitled to allow the prosecutor's comments in reply, no matter the fate of the absolute bar principle.

3. The prosecutor did not stop with a reply to the defendants' efforts to obtain favorable inferences. The prosecutor turned the tables by referring to Cohen's failure to call a particular witness. If this were an unbidden argument, we would have to resolve the conflict between our cases that appear to allow either side to argue such inferences, and our cases that limit the argument to witnesses controlled by the opposite side. But once the defendant has opened the subject, two can play. Almost every party knows of some witnesses who could have been called but were not. And Carol Banks, the witness in question, was so affiliated with the defense (as an employee of DIC) that the argument may well have been appropriate without the defendants' invitation under *Graves, Williams*, and *Chaimson*. The prosecutor probably could not have procured Banks's testimony without granting immunity, yet if Banks really would have supported Cohen's position, her testimony would not have been inculpatory, and Banks could have testified without hazard to herself. The district judge was entitled to overrule the objection to this reference, characterizing it as fair argument. The prosecutor asked for an inference, which does not alter the burden of proof. See *Dean v. Young*, 777 F.2d 1239, 1242–44 (7th Cir. 1985). The prosecutor was entitled to ask the jury to draw its own conclusions from the defendants' choices in the conduct of the trial.

### B

■ Jaroslav Herda's lawyer stated in opening argument that the evidence would show that, although he wrote prescriptions for a certain client, he did so on the basis of charts maintained by another physician (and therefore without criminal intent). In closing argument the lawyer shifted ground, maintaining that Herda had not prescribed anything for the person in question. The prosecutor cracked: "innocent people don't need to change horses in midstream."

The district judge informed the jury that Herda's two positions were not inconsistent. We doubt that this drew the sting from the prosecutor's remark, because the positions are inconsistent. "I didn't borrow the lawn mower, it was broken when I borrowed it, and I returned it in perfect condition" is the classic example of an inconsistent defense to a replevin action. "I didn't prescribe the drugs, and I prescribed them on the basis of someone else's diagnosis" is as inconsistent. See *United States*

*v. Hasting,* 461 U.S. 499, 502, 103 S.Ct. 1974, 1976, 76 L.Ed.2d 96 (1983). The prosecutor overstated the point, however, for even innocent people may "need" to change position if the evidence does not support the initial defense. A physician who prescribed drugs for 10,000 people will not remember the reason for each prescription, and evidence will affect his explanation. But the exaggeration does not affect the nature of the inference the prosecutor requested the jury to draw, and Herda's lawyer was free to offer an explanation. "[T]he government may properly comment on the inconsistencies in a defendant's case." *United States v. Scott,* 660 F.2d 1145, 1168 (7th Cir.1981). Overdrawn rhetoric in making a legitimate point does not require a new trial.

### C

The prosecutor let the jury know that he did not think very much of the lines of defense. His rebuttal argument is filled with caustic statements. The only one to which defense counsel objected is: "I can't believe some of these defense attorneys stood up in front of you with straight faces." The district judge overruled the objection because "[h]e has not called any defense attorney a liar."

■■■■■■ Attacks on the honesty and sincerity of defense counsel are improper. Counsel represent many people with lame defenses; the prosecutor was entitled to say that the defenses were lame; he was not entitled to add to that by suggesting that the defense lawyers would start sniggering as soon as they were out of the jurors' view. All the same, a comment of this sort does not suggest that the attorneys' ability to argue with poker faces is evidence in the lists against the defendants. Cf. *Young,* 470 U.S. at 9, 105 S.Ct. at 1043 ("unfounded and inflammatory attacks on the opposing advocate" are forbidden). A jury sitting through several days of closing argument is not apt to be moved by this sort of advocacy. The comment will be remembered—if at all—as a redundant statement that the theories of defense are implausible. Such a statement, stripped of

rhetoric, is appropriate. *Chaimson,* 760 F.2d at 811; *United States v. Brack,* 747 F.2d 1142, 1152 (7th Cir.1984); *United States v. West,* 670 F.2d 675, 688 (7th Cir. 1982). In a trial of this length, the rhetoric is swamped by the facts and does not call into question the reliability of the verdict. E.g., *Hasting, Young,* and *United States v. Howard,* 774 F.2d 838, 848 (7th Cir.1985); *United States v. Green,* 786 F.2d 247, 253–55 (7th Cir.1986).

### D

■■■■ The defendants objected to some of the least problematic of the prosecutor's sallies. Without objection, the prosecutor called the defenses "phony", "bogus", and "manufactured", said that they were a "smoke screen" and "just made up", indicted the closing arguments as "pretend" and "offensive", and informed the jury that "you have been misled". He summoned up his own experience, telling the jury: "Mr. Royce's defense [on behalf of Sblendorio] was the most lame defense I have ever seen in my life." He described his mental processes in deciding whether to press the case:

> When Inspector Kinnebrew came to my office with those kind [sic] of allegations, do you think I wanted to believe those things [about physicians]. Do you think there was a presumption of guilt?

He implied that the defendants should have come forward with their stories before trial:

> What did [counsel for Cohen] do to you? He offered you several *phony* defenses, several *manufactured* defenses. Again, ladies and gentlemen, if a person is wrongly accused—if we have made a mistake and they should not be here if they come up and they say, 'Here are the facts, here is why I am innocent,' they don't have to manufacture a defense. They don't have to offer inconsistent defenses. Innocent people don't have to do that.

The implication: "innocent people" explain their conduct to the prosecutor before trial and are not charged; only guilty people stand trial. The statement also could be

understood as a comment on some defendants' failure to testify on their own behalf, a genuine *Griffin* problem. Cohen was among the defendants who did not take the stand.

All of this is inappropriate and beneath the prosecutor. It is possible to put a good face on some of the comments. The government's appellate lawyer insists, for example, that the last comment refers to the failure of Cohen's lawyer to explain the evidence, rather than Cohen's silence before or during trial. The jury might as readily reach a different conclusion. We cannot fathom why a prosecutor, with overwhelming evidence on his side, stoops to such comments. They are either unprofessional or salvageable only by reconstruction.

Attorneys are supposed to marshal the evidence. When the prosecutor can show (if it is true) that the government has the evidence and the defendant the rhetoric, he has both done his job and carried the day. When the prosecutor's argument leaves the impression that *both* sides depend on rhetoric rather than evidence, then a conscientious jury should acquit (because the government bears the risk of non-persuasion), and a conviction may rest on the wrong basis. The prosecutor's rebuttal argument in this case spent far too much time advancing the wrong reasons for convictions.

Nonetheless, when the defendants do not object to the improper portions of a closing argument, only error both "plain" and "harmful" supports a new trial. Fed.R. Crim.P. 52. The conviction stands unless "a miscarriage of justice would otherwise result." *Young*, 470 U.S. at 15, 105 S.Ct. at 1047, quoting *United States v. Frady*, 456 U.S. 152, 163 n. 14, 102 S.Ct. 1584, 1592 n. 14, 71 L.Ed.2d 816 (1982). See also, e.g., *Fakhoury*, 819 F.2d at 1423; *United States v. Tucker*, 820 F.2d 234, 237–38 (7th Cir.1987). Cf. *Darden v. Wainwright*, 477 U.S. 187, 106 S.Ct. 2464, 2472, 91 L.Ed.2d 144 (1986). We are convinced that the evidence, and not the closing arguments, led to the convictions in this case. We do not condone the inappropriate—and unneces-

sary—rhetoric employed by this prosecutor, but we also do not think it produced a "miscarriage of justice". This was a long trial, was well run by the district judge and decided on the merits.

We omit separate discussion of the remaining claims, such as the contention that the prosecutor erred in referring to misconduct with which the defendants were not formally charged. We have nonetheless considered each of these contentions and conclude that none, separately or collectively, requires another trial.

AFFIRMED.