**David V. MACNAUGHTON and Virginia R. MacNaughton, Plaintiffs–Appellants,**

v.

**UNITED STATES of America, Defendant–Appellee.**

No. 88–5359.

United States Court of Appeals, Sixth Circuit.

Argued Feb. 17, 1989.

Decided Oct. 23, 1989.

Rehearing and Rehearing En Banc Denied Dec. 29, 1989.

John P. Konvalinka, M. Elizabeth McCroskey (Argued), Grant, Konvalinka & Grubbs, Chattanooga, Tenn., for David V. MacNaughton, M.D. and Virginia R. Mac-Naughton.

John W. Gill, Jr., U.S. Atty., William Sonnenberg, Asst. U.S. Atty., Chattanooga, Tenn., Gary R. Allen, Acting Chief, U.S. Dept. of Justice, Appellate Section Tax Div., Washington, D.C., William S. Rose, Jr., Asst. Atty. Gen., U.S. Dept. of Justice, Tax Div. Appellate Section, J.I. Oppenheimer (argued), Paul M. Predmore, Trial Atty., Office of the U.S. Dept. of Justice, Tax Div., Washington, D.C., for U.S.

Before KENNEDY and JONES, Circuit Judges, and SILER, Chief District Judge.*

NATHANIEL R. JONES, Circuit Judge.

Plaintiffs-appellants, David and Virginia MacNaughton, appeal the jury verdict and the district court's denial of their motion for judgment notwithstanding the verdict (JNOV) or a new trial in this action for the recovery of income tax and interest. For the reasons set forth below, we affirm.

## I.

Many of the relevant facts in this case are not in dispute. In 1975 or 1976, Jerry Edward Gilliland and Bobby Rouse formed Area Psychological Clinic, P.C. (Clinic) and became its principal shareholders. Thereafter, in 1976, Gilliland, Rouse and others (Stockholders) acquired Area Psychological Hospital, Inc. (APH or Hospital) and, in so doing, pledged 30,800 of the 40,000 authorized and issued shares of APH common stock to the sellers of the Hospital and a financing institution. The Clinic and APH had a professional affiliation whereby many of the doctors employed by the Clinic also treated patients at APH.

Prior to 1977, David MacNaughton was the sole shareholder of David V. Mac-Naughton, Jr., M.D., P.C. (PC).[1] On February 1, 1977, the Clinic hired MacNaughton as one of its in-house physicians. During the course of his employment at the Clinic, MacNaughton treated the Clinic's patients and, as one of its physicians, also admitted patients to APH. Sometime in 1977, Mac-Naughton's PC merged with APH and he exchanged his PC stock for APH stock of equal value. MacNaughton's APH stock certificate contains the following legend: "The transfer of this certificate is subject to a stock restrictive agreement, copy of which is in the office of the attorney for the corporation." J. App. at 644. The APH stock certificates of other shareholders contain a legend which states that the "transfer of this certificate is subject to a certain pledge agreement *and* a stock restrictive agreement, copies of which are in the office of the attorney for the corporation." *Id.* at 669 (emphasis added). Mac-Naughton claims that he acquired the APH stock as an investment and that he had never owned stock in the Clinic. Moreover, both he and Gilliland contend that his APH stock was not given in recognition of any services rendered for the Clinic.

In 1979, Rouse, Gilliland and several others founded Health Care Corporation (HCC). Thereafter, APH merged into Valley Psychiatric Hospital Corporation (VPH), a wholly-owned subsidiary of APH, and MacNaughton exchanged his APH stock for VPH stock in January 1980. Unlike his APH stock certificate, however,

---

* The Honorable Eugene E. Siler, Jr., Chief U.S. District Judge for the Eastern District of Kentucky, sitting by designation.

1. Virginia MacNaughton is a party in this action solely because she filed a joint 1981 income tax return with her husband.

MacNaughton's VPH stock certificates did not contain a restrictive legend. In December 1980, HCC agreed to acquire the stock of VPH and MacNaughton ultimately surrendered his VPH stock for HCC stock in March 1981. The HCC stock did not contain a restrictive legend. MacNaughton ultimately terminated his employment with the Clinic in September 1981. In December 1981, HCC subsequently merged with Hospital Corporation of America (HCA), a publicly traded corporation affiliated with APH, VPH or HCC. MacNaughton eventually exchanged his HCC stock for HCA stock (which he still owns).

On August 5, 1985, the Commissioner of the Internal Revenue Service (IRS) assessed income tax deficiencies against MacNaughton. MacNaughton paid the assessed tax and interest and filed a refund claim which the IRS subsequently denied. MacNaughton then filed suit in federal district court, seeking a refund of the taxes assessed against him.

In support of the tax assessment, the Government asserted at trial that, pursuant to section 83 of the Internal Revenue Code of 1954, MacNaughton should have included in his taxable income for 1981 the difference between the value of the HCA stock and his basis in the PC stock that he originally surrendered. Section 83 provides, in pertinent part, that

> If, in connection with the performance of services, property is transferred to any person other than the person for whom such services are performed, the excess of—
>
> (1) the fair market value of such property ... at the first time the rights of the person having the beneficial interest in such property are transferable or are not subject to a substantial risk of forfeiture, whichever occurs earlier, over
>
> (2) the amount (if any) paid for such property, shall be included in the gross income of the person who performed such services in the first taxable year in which ... such property [is] transferable or [is] not subject to a substan-

tial risk of forfeiture, whichever is applicable.

The Government introduced evidence at trial that Rouse, as President of University Hospital, Inc. (University Hospital) and Gilliland, as the Secretary–Treasurer of University Hospital, executed a stock buy/sell agreement between University Hospital and one Dr. Jones who was employed with Campbell Clinic Association, Inc. (Campbell Clinic). University Hospital and Campbell Clinic had a professional arrangement, similar to the arrangement between APH and Area Psychological Clinic, in which physicians at Campbell Clinic treated patients both at the Clinic and the Hospital. The University/Jones agreement required that Jones give University Hospital the initial right to purchase his University Hospital stock if he terminated his employment with Campbell Clinic. Although the Government insinuated that a similar agreement existed between MacNaughton and APH, Rouse and Gilliland testified that, to the best of their knowledge, no such agreement was executed.

The jury was instructed to render special verdicts on the following questions: whether MacNaughton received the APH stock in connection with the performance of services; whether the APH/VPH/HCC stock was subject to a substantial risk of forfeiture or was not otherwise freely transferable; whether any restrictions on transferability were removed in some year other than 1981; and, if so, what year the restrictions were removed. The jury found that the stock was received in connection with the performance of services, that the stock was subject to restrictions on transferability and that those restrictions were removed in 1981. Thus, the jury determined that MacNaughton should have included in his taxable income for 1981 the fair market value of the HCC stock in 1981 less the amount that MacNaughton "paid" for the APH stock in 1977.

MacNaughton moved for JNOV and for a new trial contending that the evidence was legally insufficient to support the jury's verdict; that the court erred in admitting evidence relating to the buy/sell agreement between University Hospital

and Jones; that the Government made improper remarks in closing argument; and that the jury charge contained errors. The district court rejected all of MacNaughton's claims and denied his motion. This timely appeal followed.

## II.

■ MacNaughton argues, on various grounds, that the evidence presented by the Government was insufficient to support the jury's verdict. He further contends that the district court erred in denying his motion for JNOV or a new trial. In determining whether the evidence is sufficient to support a jury verdict, the evidence, and the reasonable inferences drawn therefrom, must be viewed in the light most favorable to the non-moving party. *Wilkins v. Eaton Corp.*, 790 F.2d 515, 522 (6th Cir.1986). The court must not consider the credibility of witnesses nor weigh the evidence because to do so would "substitute the court's opinion for that of the jury." *Id.* In addition, in ruling on a motion for JNOV or a new trial on the basis of the sufficiency of the evidence, a court may not set aside the jury verdict merely because the opposite conclusion could have been reached or because different inferences could have been drawn. Rather, the court must determine whether any reasonable jury could have reached the verdict based on the evidence presented at trial. *Bruner v. Dunaway*, 684 F.2d 422, 425 (6th Cir. 1982), *cert. denied*, 459 U.S. 1171, 103 S.Ct. 816, 74 L.Ed.2d 1014 (1983).

## A.

■ MacNaughton's first contention is that section 83 applies only to stock which is compensatory in nature. Since his APH/VPH/HCC stock was not compensation for services he rendered at the Clinic, MacNaughton claims that the stock was not transferred in connection with the performance of services. Although the language of section 83 and the treasury regulations relating to the section, *see, e.g.*, Treas.Reg. § 183–3(F), do not explicitly define the phrase "in connection with the performance of services," this issue has been addressed by the Ninth Circuit Court of Appeals. In *Alves v. C.I.R.*, 734 F.2d 478, 481 (9th Cir.1984), the court discussed whether the phrase "in connection with the performance of services" means that the employee must be "receiving *compensation* for his performance of services." (Emphasis added). The *Alves* court stated that the plain language of section 83(a) belied this argument because the "statute applies to all property transferred in connection with the performance of services" and because no "reference is made to the term 'compensation.'" *Id.* The court further concluded in *Alves* that "if Congress intended section 83(a) to apply solely to restricted stock used to compensate employees, it could have used much narrower language." *Id.* at 481–82. Upon consideration, we agree with the interpretation advanced by the *Alves* court and, therefore, join the Ninth Circuit in holding that section 83 is not limited to stock transfers which are compensatory in nature.

■ Turning to the instant action, the record indicates that MacNaughton received his APH stock shortly after he began working for a Clinic affiliated with APH. In addition, Gilliland testified that a shareholder's initial acquisition of APH stock required unanimous shareholder approval and that he personally did not want the stock traded freely because he wanted shareholders to have some affiliation with the Hospital. Likewise, Rouse testified that the APH stockholders intended to sell APH stock only to people who met their approval. Finally, the Government presented evidence which indicated that many of the APH/VPH/HCC stockholders were employed by hospitals or clinics which were affiliated with the parent company. Although the jury *could* have reached the opposite conclusion, when viewing the evidence and all reasonable inferences in the light most favorable to the Government, we find that a reasonable jury also could conclude that MacNaughton received the APH/VPH/HCC stock in connection with the performance of services. Therefore, we find that the district court did not err in rejecting MacNaughton's first challenge.

## B.

■ MacNaughton next claims that his APH/VPH/HCC stock was not restricted or "subject to a substantial risk of forfeiture" because he retained the right to transfer the stock. He further asserts that while the APH stock *may* have contained a restrictive legend, the VPH and HCC stock certificates bore no restrictive legends and, thus, he could have transferred this stock to a bona fide purchaser as a matter of Tennessee law.

With respect to the APH stock, although MacNaughton provided testimonial evidence that the stock was subject only to a pledge agreement, documentary evidence showed that some of the APH stock certificates referred only to the stock restrictive agreement while others referred to the stock restrictive agreement *and* a pledge agreement. Because MacNaughton's APH stock certificate expressly stated that it was subject to a stock restrictive agreement, a reasonable jury could easily have found that MacNaughton's APH stock was restricted under section 83(a).

With respect to the VPH and HCC stock, we agree with MacNaughton's assertion that, under Tennessee law, the absence of a written legend might have allowed him to transfer the stock to a bona fide purchaser who had no notice of an unwritten restrictive agreement. *See* Tenn.Code Ann. §§ 48–1–509 (repealed 1986), 47–8–204 (amended 1986). However, transferability under section 83 does not require that a written legend appear on the stock certificates, and we agree with the First Circuit's conclusion that "[t]ransferability under § 83(a) depends on standard practices and assumes observance of contracts, not hypothetical *sub rosa* violations." *Robinson v. C.I.R.*, 805 F.2d 38, 42 (1st Cir.1986). Moreover, because Treasury Regulation § 1.83–3(c) provides that "[f]or purposes of section 83 ... whether a risk of forfeiture is substantial or not depends upon the facts and circumstances" of each situation, we reject MacNaughton's assertion that the questions of whether stock is transferable or whether a risk of forfeiture is substan-tial can be conclusively determined as a matter of law.

In examining the "facts and circumstances" in this case, we agree with the district court's conclusion that Rouse, Gilliland and the other stockholders in the closely-held, affiliated corporations involved in the action could have agreed among themselves to restrict the sale of the VPH and HCC stock. Since the primary shareholders of APH/VPH/HCC testified that they intended to restrict the sale of the stock, a reasonable jury could have concluded that the restrictions on the stock remained even after the removal of the written legend. Moreover, while we agree with MacNaughton's assertion that the evidence concerning the buy/sell agreement between University Hospital and Jones does not *prove* that a similar agreement existed between APH/VPH/HCC and MacNaughton, we note that the professional affiliation between University Hospital and Campbell Clinic was virtually identical to APH/VPH/HCC's affiliation with Area Psychological Clinic. In addition, Gilliland and Rouse executed the agreement with Jones during the same time period in which they exchanged MacNaughton's APH stock for VPH stock. Moreover, while Gilliland testified that he did not think there was a similar buy/sell agreement involving MacNaughton, he stated at trial that he did not remember the University/Jones agreement until the Government produced the document at trial. Based upon this evidence, we believe that a reasonable jury could have concluded that the VPH and HCC stock was restricted and that the restrictions were not removed until MacNaughton exchanged his HCC stock for HCA stock in 1981. Therefore, we reject MacNaughton's arguments in this regard.

## III.

MacNaughton also challenges several of the district court's evidentiary rulings. A trial court's decision on the admission of evidence is reviewed under an abuse of discretion standard. *Schrand v. Federal Pacific Elec. Co.*, 851 F.2d 152, 156–57 (6th Cir.1988). "In the context of an evidentia-

ry ruling, abuse of discretion exists when the reviewing court is firmly convinced that a mistake has been made." *Id.* at 157. (citations omitted).

## A.

■ MacNaughton's primary contention is that the district court committed reversible error in admitting into evidence the buy/sell agreement between University Hospital and Jones. The Government contends that the exhibit was admissible because its existence suggests that a similar agreement was executed between MacNaughton and VPH. The transcript of the trial indicates that, just prior to the introduction of the University/Jones agreement, the trial court allowed MacNaughton to admit into evidence, over the Government's objection, a separate "financing pledge agreement" which had been prepared in connection with a loan involving the purchase of VPH. In introducing the University/Jones agreement, the Government argued that it should be admitted to rebut MacNaughton's suggestion that any restrictions on the APH or VPH stock referred to the "financing pledge agreement" rather than an agreement which restricted the transferability of the stock.

Because the "financing pledge agreement" was first produced on the day of the trial, because MacNaughton introduced this agreement to show that no other stock restrictive agreement existed, and because Gilliland admitted that he did not "remember" the University/Jones agreement until the Government produced the document at trial, we do not think that the district court abused its discretion in admitting this evidence.

## B.

■ MacNaughton also contends that the district court should not have permitted the Government to make references to APH's attorneys. During closing argument, MacNaughton claims that the Government was improperly allowed to suggest to the jury that an unfavorable inference should be drawn from the failure of APH's attorney, who was also Mac-

Naughton's trial attorney, to take the witness stand and to produce the "missing" restrictive agreement. This court has held that "[w]hen the government wishes to request the jury to draw an inference adverse to the defendant because potential defense witnesses have not testified, the government must obtain an advance ruling." *United States v. Martin*, 696 F.2d 49, 52 (6th Cir.), *cert. denied*, 460 U.S. 1073, 103 S.Ct. 1532, 75 L.Ed.2d 953 (1983). Although the *Martin* court stated that "a strong implication, rather than a direct request, could under some circumstances invite the jury to draw an adverse inference," this court has essentially limited the advance ruling requirement to cases in which the Government specifically requests the jury to draw an adverse inference. *Id.* at 52. Thus, in order to determine whether prior court approval is required, we must apply the test provided in *United States v. Blakemore*, 489 F.2d 193 (6th Cir.1973). In *Blakemore*, this court stated that a party, without prior court approval, may make an adverse inference from the other party's failure to call witnesses if the witnesses are peculiarly within the other party's power to produce and if their testimony would elucidate the events at issue. *Id.* at 195.

Applying *Martin* and *Blakemore* to the instant action, we find that the district court did not commit reversible error in overruling MacNaughton's objections to the Government's remarks during closing argument. Because the witnesses, the attorneys in the firm representing MacNaughton at trial, were peculiarly within MacNaughton's power to produce and because their testimony may have resolved the issue of whether MacNaughton's stock was subject to any restrictive agreements, we hold that the Government's comments during closing argument were not improper.

## V.

Finally, MacNaughton challenges several alleged errors in the district court's jury charge. In examining jury instructions, "the critical inquiry is whether the instructions as a whole provide the jury with

sufficient guidance concerning the issue to be tried." *Teal v. E.I. DuPont de Nemours and Co.*, 728 F.2d 799, 802 (6th Cir. 1984). Because we find that the district court's instructions as a whole sufficiently charged the jury, we reject MacNaughton's challenges to the jury charges.

## VI.

For the reasons discussed above, judgment is hereby AFFIRMED.

SILER, District Judge, dissenting.

I concur with that part of the majority opinion set out in II.A., that Section 83 of the Internal Revenue Code applies to the stock transaction involved, but I respectfully dissent in other respects.

Plaintiff had the burden of proof here. *See Coleman v. United States*, 704 F.2d 326 (6th Cir.1983). However, he met that burden by uncontradicted evidence on several crucial issues. For that reason, I believe that as a matter of law, plaintiff's stock was transferable and not subject to a substantial risk of forfeiture prior to 1981. Therefore, under Section 83, he should have been assessed for income in another year, not for 1981.

When plaintiff in 1977 received the stock of Area Psychological Hospital, Inc. (APH) in exchange for his PC stock, it was restricted by language on the face of the certificate, as stated in the majority opinion. Even though some APH stock certificates to other shareholders referred to a "stock restrictive agreement and pledge agreement," the evidence was uncontradicted that the only restrictive agreement on this APH stock was the pledge agreement. Perhaps the language on the stock certificate could have been more precise, but the plaintiff and Dr. Jerry Edward Gilliland testified that the only restriction on the stock was a financing restriction, not a restriction on the transfer of it.

The sole possible contradiction to that proof was by inference from a buy-sale agreement of May 18, 1977, between University Hospital, Inc. and Dr. Gerald Jones. Although Drs. Bobby Rouse and Gilliland were officers and shareholders of both APH and University Hospital, there was no other evidence linking the buy-sale agreement with Jones to any similar agreement with the plaintiff. In my opinion, an analogous document between different parties does not constitute substantive evidence to rebut the testimony of plaintiff and Gilliland.

Moreover, even if that constituted evidence on the issue, there was no evidence by the defendant that when the APH stock was subsequently exchanged for Valley Psychiatric Hospital Corporation (VPH) stock in 1980, or when the VPH stock was further exchanged in 1980 for Health Care Corporation (HCC) stock, there were restrictions on the stock. Instead, the government relies upon the implication that as Rouse and Gilliland were basically in control of the stock of all these successor corporations, they restricted it by personal desire and without any legends upon the certificates.

Certainly, *Robinson v. Commissioner*, 805 F.2d 38 (1st Cir.1986), held that transferability under Section 83 does not depend upon language in any written legend upon the certificates. Nevertheless, as the majority finds, *Robinson* held that "[t]ransferability under § 83(a) depends upon standard practices and assumes observance of contracts." *Id.* at 42. Here, however, there was no contract between the plaintiff and Rouse and Gilliland through the corporations, as occurred in *Robinson*.

Therefore, as a matter of law, there was no evidence to contradict the proof that the stock restrictions were removed at some year prior to 1981. Without that proof, the government cannot prevail, as the stock bore no legends in 1980. Gilliland and Rouse both said that a person who initially acquired stock of APH had to receive shareholder approval and they did not desire a free trade of the shares of APH stock, but it was never proven that there was any standard practice or contract for APH, let alone a standard practice or contract involving the successor corporations, as *Robinson* required.

With regard to some of the remaining issues, although the buy-sale agreement between University Hospital and Jones was not substantive evidence that there was a restrictive agreement on the APH stock, it was admissible to impeach Gilliland by showing that he had a faulty memory concerning details of contracts he signed. The government has not cited any federal rule of evidence under which the document was admissible otherwise. It was obviously not a habit or routine practice under Federal Rule of Evidence 406 of Gilliland, Rouse or their corporations, as it occurred only on one occasion. *See Utility Control Corp. v. Prince William Construction Co.*, 558 F.2d 716 (4th Cir.1977).

I also must disagree with the majority on one other issue, that is, concerning whether the trial court committed error by failing to take some corrective action against the government in closing argument. The government counsel had stated: "So, where is the stock restrictive agreement? That seems to be the $64,000 question in this case. Well, everybody that took the stand said the certificate says it's in the attorney's office for the corporation, and the attorney is Mr. Konvalinka's office, but he has chosen to represent the plaintiff in this case, so he can't take that stand and explain to us where this restrictive agreement is. Is there something being hidden here?"

This was an improper argument. The potential witness, although a partner to plaintiff's counsel, was never declared by the court to be unavailable, and the defense never attempted to depose him or call him as a witness.

The attorney was not peculiarly within plaintiff's power to produce. Moreover, the records of the stock restrictions were not within the scope of any attorney-client privilege, as it was information that the client intended the attorney to impart to others. *See United States v. Aronson*, 781 F.2d 1580 (11th Cir.1986) (per curiam); *United States v. (Under Seal)*, 748 F.2d 871 (4th Cir.1984); *United States v. Davis,*

636 F.2d 1028 (5th Cir.1981), *cert. denied,* 454 U.S. 862, 102 S.Ct. 320, 70 L.Ed.2d 162 (1982); *cf. In re Grand Jury Empanelled March 8, 1983,* 722 F.2d 294 (6th Cir.1983), *cert. dismissed sub nom. Butcher v. United States,* 465 U.S. 1085, 104 S.Ct. 1458, 79 L.Ed.2d 774 (1984). Besides, the attorney for the corporation did not have an attorney-client relationship with the plaintiff until his partner later represented plaintiff in this case.

As the witness was not peculiarly within the power of the plaintiff to produce, it was error for defense counsel to have made the argument without prior court approval. *See United States v. Beeler,* 587 F.2d 340 (6th Cir.1978); *United States v. Blakemore,* 489 F.2d 193 (6th Cir.1973). It is realized that government counsel did not direct the jury to draw an adverse inference for failure to call the witness, in those exact words, but, as the majority opinion states, *United States v. Martin,* 696 F.2d 49, 52 (6th Cir.), *cert. denied,* 460 U.S. 1073, 103 S.Ct. 1532, 75 L.Ed.2d 953 (1983), held that a strong implication could invite such an adverse inference to be drawn under the right circumstances. I believe such a strong implication arose here.

Nevertheless, I would not reverse the trial court on this issue alone. When the argument was made, plaintiff's counsel did not object immediately, but waited until government counsel's argument was complete and the jury had retired to deliberate.[1] Then he moved the court for a new trial. The better procedure would have been to have requested an admonition, allowing the court to advise the jury that the witness was not solely available to the plaintiff, and no adverse inference should be drawn from his absence. Because no admonition was requested and because there was only this one reference to the failure to produce the witness, the error was harmless. *See Chicago College of Osteopathic Medicine v. George A. Fuller Co.,* 719 F.2d 1335, 1354 (7th Cir.1983).

---

1. This, of course, may not be fatal to plaintiff's case, if a miscarriage of justice has resulted.

*See Klotz v. Sears Roebuck and Company,* 267 F.2d 53 (7th Cir.1959).

Therefore, I would reverse the trial court for failure to grant a directed verdict and enter judgment on behalf of the taxpayer.