12 F.3d 214
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Juraj PAVICIC, Plaintiff-Appellee,
v.
MICRO LAPPING AND GRINDING CO., INC., and Raymond Robaugh,
Defendants-Appellants.
 No. 92-4333.
 United States Court of Appeals, Sixth Circuit.
 Dec. 2, 1993.
 
 Before: GUY and RYAN, Circuit Judges; and MILES,* Senior District Judge.
 PER CURIAM.
 
 
 1
 Defendants, Micro Lapping and Grinding Co. and Raymond Robaugh, appeal the district judge's denial of their motions for judgment as a matter of law and of their renewed motion for judgment as a matter of law. Defendants argue that plaintiff, Juraj Pavicic, failed to present sufficient evidence to support the jury's finding of age discrimination by defendants in violation of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. Sec. 621 et seq. Defendants also appeal denial of their motion to dismiss, arguing that they properly raised a statute of limitations defense in their post-verdict motion. We affirm.
 
 I.
 
 2
 Pavicic was hired by Micro Lapping in July 1969 as a maintenance person. His duties included the repair and maintenance of the machinery in Micro Lapping's plant and some electrician work. Much of this work was done while on a ladder, at elevations of up to 20 feet. The parties have stipulated that Pavicic's performance of this work was satisfactory.
 
 
 3
 In early 1987, Pavicic began to have difficulty controlling his left arm, hand, and fingers. On April 16, 1987, he visited Dr. Thomas Tank, a neurosurgeon, who shortly discovered that Pavicic had a brain tumor. Pavicic consequently took a medical leave of absence from Micro Lapping on June 12, 1987, and was operated on by Dr. Tank on June 22, 1987.
 
 
 4
 Pavicic's leave of absence continued after his surgery, and he made follow-up visits to Dr. Tank on August 6, September 10, and December 10, 1987, and on February 4 and June 2, 1988. During the 1987 visits and the February 1988 visit, Pavicic complained of dizziness, vertigo, and headaches.
 
 
 5
 During the February 1988 visit, Pavicic advised Dr. Tank that he had applied for disability payments under Micro Lapping's disability insurance policy with the New York Life Insurance Corporation. The application process required Pavicic to complete and sign the front of a benefit form and submit it to Micro Lapping, which would then send the form to the treating doctor. As a matter of practice, however, Micro Lapping would usually fill out the front of the form for its employees and merely have them sign it. The doctor would then sign the back of the form and return it to Micro Lapping, which would send it to New York Life. This process had to be repeated twice monthly to ensure an unbroken string of benefit checks. Dr. Tank assured Pavicic that he would promptly complete Pavicic's benefit forms when he received them from Micro Lapping.
 
 
 6
 Dr. Tank received the first of these benefit forms later that month. On February 24, 1988, Dr. Tank indicated on the back of this form that Pavicic's projected return to work date was April 1, 1988. On March 12, 1988, Pavicic signed the next benefit form (the "March 12 form"). Like the back of the first form, the front of the March 12 form indicated that he would be disabled until April 1, 1988, and was given to Micro Lapping.
 
 
 7
 Pavicic had a copy of the March 12 form with him when he and his son Mario visited the offices of Micro Lapping on March 17, 1988. There Pavicic spoke with Raymond Robaugh, president of Micro Lapping, about the prospect of his return to work. Pavicic offered a copy of the March 12 form, with its projected return to work date of April 1, as evidence that he would be able to resume work shortly. The contents of the remainder of this conversation are sharply disputed by the parties. Pavicic maintains that Robaugh told him that he was "too old and sick" to return to Micro Lapping and that someone had been hired to replace him. Pavicic's 35 year-old nephew, Ivan Pavicic, had in fact assumed his uncle's responsibilities at Micro Lapping in Pavicic's absence. Robaugh, however, denies making this remark, and instead asserts that he (1) told Pavicic that company policy required that Pavicic obtain a formal medical release prior to returning to work, and (2) offered Pavicic another position that would pose less danger to a person susceptible to bouts of dizziness and vertigo. This offer allegedly was rejected. After this meeting, Micro Lapping continued to regard Pavicic as a Micro Lapping employee on medical leave, as Micro Lapping continued to pay for Pavicic's health, life, and disability insurance, and Pavicic continued to receive his disability insurance payments through Micro Lapping.
 
 
 8
 Dr. Tank had received the March 12 form by the time of the March 17, 1988, meeting between Pavicic and Robaugh. On that very day, Dr. Tank signed the back of the March 12 form and indicated there that Pavicic would be disabled until July 1, 1988, instead of the April 1, 1988, date that Pavicic had filled in on the front of the form. Dr. Tank, however, had not seen Pavicic since he signed the February 24 form which indicated an April 1 return to work date. An unknown Micro Lapping employee also changed the projected return to work date on the front of this form from April 1, 1988, to July 1, 1988. This change was made either just before the March 12 form was sent to Dr. Tank, or just after it was returned to Micro Lapping. In any event, the form was submitted to New York Life without Pavicic having been informed of the change in his projected return to work date.
 
 
 9
 The March 12 form alteration was significant because Robaugh contends that in 1988 he understood that it was settled company policy to terminate any person whose leave of absence extended beyond one year. In fact, Micro Lapping policy, as set forth in a document signed by Robaugh in 1986, provided for a two-year leave of absence before termination. The change in Pavicic's projected return to work date would place him within the one-year leave period that Robaugh thought was in effect.
 
 
 10
 Pavicic signed another benefit form on April 12, 1988. At the time of his signing, this form set forth yet another projected return to work date, namely, September 1, 1988. Dr. Tank endorsed this change, although he had still not seen Pavicic since Pavicic's February 4, 1988, visit to his office.
 
 
 11
 Pavicic alleges that he and his son again met with Robaugh on April 13, 1988, the day after he signed the April 12 form. Pavicic maintains that he again expressed his desire to return to work, and that Robaugh repeated that he would not be allowed to return to Micro Lapping. Robaugh, however, denies that this conversation took place.
 
 
 12
 Pavicic visited Dr. Tank for the last time on June 2, 1988, and brought with him the results of a magnetic response imaging (MRI) study that had been performed on his brain by another doctor on May 8, 1988. Pavicic maintains that he did not complain of any health problems to Dr. Tank during this visit. In contrast, Dr. Tank contends that Pavicic again complained of bouts of dizziness and episodes of the room spinning to the left. He further stated that Pavicic's MRI revealed a large fluid collection over the site of the previous surgery, which suggested to him that Pavicic's brain tumor had returned. Dr. Tank hence thought that another brain operation was needed. Dr. Tank's contemporaneous record of the visit corroborates all aspects of his account.
 
 
 13
 Robaugh mailed to Pavicic a letter dated June 14, 1988, which stated that Pavicic's employment with Micro Lapping was terminated because his leave of absence had extended beyond one year. The letter also indicated that Pavicic could continue to receive disability insurance payments from New York Life until June 1989, albeit directly from New York Life and not through Micro Lapping. Pavicic did in fact receive these payments until June 1989. Although Pavicic maintains that he has been healthy and able to return to work since April 1, 1988, the benefit forms that he signed stated that he was totally disabled until June 1989.
 
 
 14
 On December 21, 1988, Pavicic filed an age discrimination charge with the Equal Employment Opportunity Commission (EEOC). In June 1989, the EEOC determined that Pavicic had not established a case of age discrimination against Micro Lapping. On November 16, 1990, Pavicic filed a pro se complaint against Micro Lapping and Robaugh, charging age discrimination in violation of the ADEA. Defendants thereafter filed a motion for summary judgment, which was denied. At trial, Pavicic (1) testified as to his version of the March 17, 1988, conversation with Robaugh; (2) presented evidence that he had been replaced by his 35 year-old nephew, Ivan Pavicic; (3) testified as to the alleged April 13, 1988, conversation with Robaugh; (4) presented uncontested evidence that Micro Lapping had changed the projected return to work date on his March 12, 1988, benefits form; (5) testified as to his version of his June 2, 1988, visit with Dr. Tank; and (6) presented evidence that Dr. Tank cooperated with the EEOC's investigation without his permission, and that Micro Lapping paid Dr. Tank $2,000 to give deposition testimony. At the close of Pavicic's case-in-chief, defendants moved for judgment as a matter of law, which was overruled.
 
 
 15
 In their defense, Micro Lapping and Robaugh (1) produced testimony supporting their version of the March 17, 1988, meeting with Pavicic; (2) presented unrefuted evidence that persons protected by the ADEA were well represented in the Micro Lapping workforce; and (3) introduced evidence that Pavicic was in fact physically unable to return to work in June 1988 and thereafter, which evidence included Dr. Tank's testimony and documentary evidence concerning the June 2, 1988, office visit, and disability insurance benefit forms signed by Pavicic that stated he was "totally disabled" as late as June 1989.
 
 
 16
 At the close of the presentation of evidence, defendants again moved for judgment as a matter of law, which was overruled. The jury returned a verdict in favor of Pavicic, as it found that age was a determining factor in his termination, and it awarded him $217,000 for back pay and front pay. For purposes of a liquidated damages award, however, the jury found that the defendants' violation of the ADEA was not "willful." Defendants then filed a motion to dismiss, arguing that Pavicic's claim was barred by the statute of limitations for non-willful violations of the ADEA. The district judge denied this motion, and entered judgment in accordance with the jury's verdict. Defendants then filed a renewed motion for judgment as a matter of law, or, in the alternative, for a new trial. The district judge denied this motion. This appeal followed.
 
 II.
 
 17
 Defendants argue that Pavicic failed to establish his prima facie case because he did not prove that he was physically able to return to work at Micro Lapping. We do not consider the merits of this argument, because "it is now firmly established in this circuit that when a case has been tried on the merits, a reviewing appellate court need not address the sufficiency of plaintiff's prima facie case, and may instead proceed directly to the ultimate question [of] whether plaintiff has established discrimination." Brownlow v. Edgecomb Metals, Co., 867 F.2d 960, 963 (6th Cir.1989).
 
 
 18
 Defendants argue that Pavicic presented insufficient evidence to support the jury's finding of age discrimination. The Brownlow court observed that the question of "whether age was a determining factor in the employer's decision to fire the plaintiff" is "quintessentially a question of fact." Id. In McNaughton v. United States, 888 F.2d 418, 421 (6th Cir.1989), we stated:
 
 
 19
 In determining whether the evidence is sufficient to support a jury verdict, the evidence, and the reasonable inferences drawn therefrom, must be viewed in the light most favorable to the non-moving party. The court must not consider the credibility of witnesses nor weigh the evidence because to do so would "substitute the court's opinion for that of the jury. In addition ... a court may not set aside the jury verdict merely because the opposite conclusion could have been reached or because different inferences could have been drawn. Rather, the court must determine whether any reasonable jury could have reached the verdict based on the evidence presented at trial.
 
 
 20
 (Citations omitted). This standard governs our review of both the district judge's denial of the Rule 50(a) motions for judgment as a matter of law and of the Rule 50(b) renewal motion. Agristor Leasing v. A.O. Smith Harvestore Prods., 869 F.2d 264, 268 (6th Cir.1989).
 
 
 21
 The parties sharply disagree as to when the termination decision was made. Defendants assert that this decision was not made until June 1988, when Pavicic's leave of absence had extended beyond one year. In contrast, Pavicic maintains that the termination decision was made at the time of his March 17, 1988, meeting with Robaugh. The jury clearly chose to believe Pavicic. We, too, therefore must regard Pavicic's account as true, and so must regard March 17, 1988, as the date of Robaugh's decision to terminate Pavicic. As will be seen, this fact decisively affects our analysis.
 
 
 22
 In an attempt to shift the focus of our review forward to June 1988, defendants emphasize that, even if Robaugh's decision was made in March of 1988, Micro Lapping did not take any adverse employment action against Pavicic until June 14 of that year. This point is irrelevant under the applicable law. The Supreme Court has instructed that the "present, active tense" of the words of the employment discrimination statutes ("to fail or refuse to hire or to discharge any individual ... because of his age[,]" 29 U.S.C. Sec. 623(a)(1); see also 42 U.S.C. Sec. 2000e-2(a)(1)), commands an inquiry into whether an adverse employment decision was based upon forbidden factors "at the moment it was made [,]" and not at the moment it was effectuated. Price Waterhouse v. Hopkins, 490 U.S. 228, 240-41 (1989) (plurality opinion of Brennan, J.) (emphasis in original); see also Chardon v. Fernandez, 454 U.S. 6, 8 (1981).
 
 
 23
 We accordingly review whether there is sufficient evidence to support a finding that Robaugh acted with a discriminatory motive on March 17, 1988. Here, Pavicic's most significant evidence is Robaugh's remark to Pavicic that he was "too old and sick" to return to Micro Lapping. This statement could be viewed by the jury as direct evidence that age was a determining factor in Robaugh's decision to terminate Pavicic.
 
 
 24
 Defendants argue, however, that binding precedent precludes our finding that a single remark can itself be sufficient evidence to support a jury verdict in an ADEA claimant's favor. Defendants rely in particular upon Gagne v. Northwestern National Insurance Co., 881 F.2d 309 (6th Cir.1989), where the ADEA plaintiff's former supervisor had once stated that he "needed younger blood." There, we concluded that this remark, standing alone, was not sufficient evidence to create a material factual issue as to whether Gagne's dismissal was motivated by her age. Gagne herself had characterized this remark as "isolated" and "indicated that the statement was made facetiously and was not directed at any particular individual." Id. at 314. These facts vitiated the remark's evidentiary force, and we therefore held that it was too "ambiguous" and "abstract" to support a finding of age discrimination. Id.
 
 
 25
 Pavicic's case is buttressed by evidence other than Robaugh's comment and thus Gagne is inapposite to our facts. It is worth noting, however, that Robaugh's remark is different in kind from the remark in Gagne. Here, the remark was pointed, clear, and directed towards Pavicic individually. It was, moreover, of the most serious nature, as it was in fact offered as an explanation for why Pavicic would not be able to return to Micro Lapping. This was not the sort of "stray remark" by a "nondecisionmaker" upon which Justice O'Connor has cautioned against relying. See Price Waterhouse, 490 U.S. at 277 (O'Connor, J., concurring in the judgment). This does not mean that a single remark is sufficient to support a finding of discrimination, but rather that some remarks have greater evidentiary force than others.
 
 
 26
 Pavicic also presented evidence that Micro Lapping changed the date of Pavicic's projected return to work on a disability insurance form, without his knowledge and after he had signed the form on March 12, 1988. The return date on the form was changed from April 1, 1988, to July 1, 1988. The precise date on which this change was made is unclear, but it was very close to the March 17, 1988, meeting between Pavicic and Robaugh. This change extended Pavicic's projected leave of absence beyond the one-year limit that Robaugh thought was in effect at that time. The timing, import, and secretive nature of this change might not compel, but nonetheless supports, a reasonable inference that Micro Lapping altered the return date to provide cover for its decision to terminate Pavicic because of his age. This inference is made stronger by the fact that Micro Lapping specifically relied upon this form's altered return to work date when it denied to the EEOC that age was a determining factor in Pavicic's termination. In a sworn statement to the EEOC, Robaugh wrote:
 
 
 27
 Mr. Pavicic's allegation that he was terminated because he was too old and too sick to return to work is completely without merit. A cursory examination of Mr. Pavicic's application for benefits reveals that he was undergoing serious physical difficulties during the period in which he alleges he was denied employment. Furthermore, the application for benefits dated March 12, 1988, indicates that Mr. Pavicic was continuously totally disabled from June 12, 1987 to approximately July 1, 1988.
 
 
 28
 (Robaugh Tr. at 238) (emphasis supplied). Micro Lapping did not inform the EEOC that it had altered the projected return date upon which it relied.
 
 
 29
 Pavicic's case gains further, if modest, support from Dr. Tank's notation on the March 12 benefit form that Pavicic was not expected to return to work before July 1, 1988, instead of April 1, 1988, as Dr. Tank had projected a few weeks earlier. Dr. Tank did not see Pavicic in the interval between the different projections. Admittedly, a jury might conclude that Dr. Tank revised his earlier projection simply to ensure that Pavicic continued to receive disability benefits. But it would not be irrational for a jury to instead infer that Dr. Tank was acting in concert with Robaugh on March 17, 1988. This inference is perhaps bolstered by the fact that Dr. Tank appeared as a paid witness for the defendants.
 
 
 30
 The strength of Pavicic's evidence is not affected by a good deal of the evidence presented by defendants. Evidence that Pavicic was in fact totally disabled until June 1989 is irrelevant to our inquiry, because we are concerned with Robaugh's motives on March 17, 1988, and not thereafter. On that date, Robaugh could not have known that Dr. Tank's records would indicate that Pavicic was still disabled on June 2, 1988; nor could Robaugh have known that Pavicic would later sign benefit forms which stated that he was totally disabled as late as June 1989. These facts therefore do not illuminate Robaugh's motives at the moment he decided to terminate Pavicic.
 
 
 31
 That persons protected by the ADEA were well represented in the Micro Lapping work force does cut against Pavicic's evidence that Robaugh acted with a discriminatory motive on March 17, 1988. The relationship between this statistical evidence and Robaugh's motives is, however, more indirect than the relationship between Pavicic's evidence and Robaugh's motives. Thus, even after considering defendants' statistical evidence, a reasonable jury could conclude that Robaugh acted with discriminatory intent on March 17, 1988.
 
 
 32
 We therefore conclude that, although this is a close case, Pavicic presented sufficient evidence to support the jury's finding of age discrimination. When taken together, Pavicic's account of his March 17, 1988, meeting with Robaugh and the circumstantial evidence of improper motive constitute adequate grounds for a reasonable jury to conclude that age was a determining factor in Pavicic's termination.
 
 III.
 
 33
 Defendants appeal the denial of their post-verdict motion to dismiss, which raised a statute of limitations defense. Section 626(e)(1) of the ADEA incorporates by reference the limitations period of the Portal-to-Portal Act of 1947, 29 U.S.C. Sec. 255(a),[1] which mandates that actions
 
 
 34
 be commenced within two years after the cause of action accrued, and every such action shall be forever barred unless commenced within two years after the cause of action accrued, except that a cause of action arising out of a willful violation may be commenced within three years after the cause of action accrued.
 
 
 35
 Pavicic filed his ADEA complaint more than two years, but less than three years, after he was terminated by Micro Lapping. Because the jury found, for purposes of an age discrimination award, that defendants' violation of the ADEA was not willful, defendants argue that Pavicic's claim is time-barred. In considering defendants' arguments, we assume arguendo that the meaning of "willful" for liquidated damages purposes is identical to its meaning for limitations purposes.
 
 
 36
 The first of defendants' two arguments here is that they properly raised a statute of limitations defense in their answer. The answer denied that Pavicic had complied with all of the "procedural prerequisites" to the assertion of his claim, and further stated that "[p]laintiff failed to comply with the statutorily mandated prerequisites to filing an [ADEA] action[.]" When, however, Pavicic in an interrogatory asked defendants to explain in detail the factual bases for their "prerequisites" defense, defendants merely responded that "[p]laintiff has failed to file with appropriate state agencies as required by law." Pavicic consequently was in no way "properly apprised of [defendants'] concerns for the jurisdictional basis of this suit." Herman v. National Broadcasting Co., 569 F.Supp. 282, 287 (N.D.Ill.1983), modified in part, 744 F.2d 604 (7th Cir.1989). We therefore hold that defendants did not raise a statute of limitations defense in their answer.
 
 
 37
 It is well settled that "[p]ursuant to Rule 8(c) of the Federal Rules of Civil Procedure, a defense based upon a statute of limitations is waived if not raised in the first responsive pleading." Haskell v. Washington Township, 864 F.2d 1266, 1273 (6th Cir.1988). Defendants, however, seek to avoid this rule's application by relying upon an exception to it. We have held that a tardy statute of limitations defense is not waived "when it clearly appears on the face of the pleadings and is raised in a motion to dismiss," so long as plaintiff would not be prejudiced by the defendant's delay in asserting the defense. Pierce v. County of Oakland, 652 F.2d 671, 672 (6th Cir.1981). Common examples of prejudice include plaintiff's incurring of substantial litigation expenses before the defense is raised, id. at 673, and plaintiff's action or forbearance in reliance upon defendant's failure to raise the defense. Estes v. Kentucky Utils. Co., 636 F.2d 1131, 1134 (6th Cir.1980).
 
 
 38
 Defendants raised their statute of limitations defense after the jury returned its verdict, and thus after Pavicic had incurred virtually all of his litigation costs. Moreover, defendants' failure to raise this defense before trial denied Pavicic the opportunity to present evidence that the limitations period for his claim should have been tolled. We thus agree with the district judge that Pavicic would be greatly prejudiced if defendants were allowed to raise their statute of limitations defense for the first time in a post-verdict motion to dismiss.
 
 
 39
 In reaching this conclusion, we reject defendants' argument that they could not have raised this defense before the jury made its finding on the willfulness issue. Defendants should have asserted this defense in their answer, so that the issues relative to it could have been fully and timely litigated. We therefore conclude that:
 
 
 40
 If counsel believed that any serious question might exist as to possible expiration of the relevant statutory limitations periods, then in fairness to all parties, the defense should have been explicitly preserved in the answer, or as soon thereafter as possible. The misleading nature of the original answer, together with the ensuing long delay in seeking amendment and consequent prejudice to the plaintiff amounted to a waiver of the defense of the statute of limitations.
 
 
 41
 Hayden v. Ford Motor Co., 497 F.2d 1292, 1295 (6th Cir.1974) (quoting Faith v. Texaco, Inc., 48 F.R.D. 118, 121 (W.D.Mich.1969)).
 
 
 42
 AFFIRMED.
 
 
 
 *
 Honorable Wendell A. Miles, United States District Court for the Western District of Michigan, sitting by designation
 
 
 [1]
 The Civil Rights Act of 1991, Pub.L. No. 102-166, amended 29 U.S.C. Sec. 626(e)(1) to omit the incorporation of the limitations period of 29 U.S.C. Sec. 255(a). For two reasons, we nonetheless apply to Pavicic's case the limitations scheme in effect before this amendment. First, the amended Sec. 626(e)(1) sets forth a limitations scheme that is different in kind from its predecessor, and with which Pavicic could not have possibly complied. Second, we have held that the Civil Rights Act of 1991 is not to be given retroactive effect, although the Supreme Court has decided to review this holding. See Harvis v. Roadway Express, Inc., 973 F.2d 490, 495-97 (6th Cir.1992), cert. granted, 113 S.Ct. 1250 (U.S. Feb. 22, 1993) (No. 92-938)