79 F.3d 1149
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Ted STACY, Plaintiff-Appellee/Appellant,
v.
Richard S. FRASER, and Barbara Fraser, Defendants-Appellants,
and
William D. Koehler, Defendant-Appellee.
 Nos. 94-3850, 94-3932.
 United States Court of Appeals, Sixth Circuit.
 March 12, 1996.
 
 Before: LIVELY, KENNEDY, and RYAN, Circuit Judges.
 RYAN, Circuit Judge.
 
 
 1
 Plaintiff Ted Stacy sued defendants Richard S. Fraser, Barbara Fraser, and William D. Koehler for fraudulent inducement to contract and for fraudulent conveyance. The court entered judgment for Koehler as a matter of law shortly before the case was submitted to the jury. The jury later returned a verdict for Stacy and against the Frasers on Stacy's fraudulent inducement and fraudulent conveyance claims.
 
 
 2
 Stacy appeals the judgment for Koehler, and the Frasers appeal both the judgments against them and the denial of their motions for judgment as a matter of law and for a new trial.
 
 
 3
 We reverse the judgment for Koehler, affirm the judgments against the Frasers, and affirm the denial of the Frasers' motions.
 
 I.
 
 4
 In 1985, Richard Fraser and William Koehler formed a parent company called FKS of Cincinnati, Inc., which had three separately incorporated subsidiaries that operated nightclubs in Toledo and Columbus, Ohio, and Detroit, Michigan. William Koehler was the president of FKS of Detroit, Inc., and Richard Fraser was its chairman. FKS of Detroit operated a nightclub called Streamers that was located in Sterling Heights, Michigan. In October 1987, Ted Stacy invested in defendants' Streamers nightclub.
 
 
 5
 In March 1987, before Stacy's investment, the gross revenues of Streamers dropped rapidly. By year's end, the club had suffered a 56% decline in revenues. Fraser and Koehler sought investors in order to reconcept Streamers into a new nightclub, later to become known as Fizz. On October 6, 1987, Stacy met with Fraser and Koehler at the Bellwood Country Club in Morrow, Ohio, to discuss Stacy's potential investment in the reconcepting of Streamers. At this Bellwood meeting, Fraser and Koehler agreed that they would not take any personal remuneration or management fee from the reconcepted Streamers. They further agreed to pay Stacy 8% of the gross sales from Fizz and 1% of the gross sales from their St. Louis, Missouri, nightclub operation, Menage, after it opened.
 
 
 6
 At the Bellwood meeting, Fraser and Koehler provided Stacy with the consolidated 1986 calendar year tax return of FKS of Cincinnati and its subsidiaries, together with attached schedules, and an offering circular, or prospectus, dated August 5, 1987, for the potential St. Louis, Missouri, nightclub operation Menage. The Menage document contained a paragraph projecting that, following the renovation, Streamer's annual gross sales would exceed $3 million. Stacy testified at trial that he reviewed these documents and asked for Fraser's personal financial statement. Fraser replied that he did not have a personal financial statement but was worth something over $3 million.
 
 
 7
 Using information provided to him at the Bellwood meeting, Stacy concluded that his proposed investment in Streamers should be profitable. Although Fraser and Koehler stated that they were having cash flow problems in Detroit because of the drain of cash from the Detroit operations to the Toledo and Columbus operations, they did not inform Stacy that Streamer itself had experienced a severe drop in profits. Stacy understood that the other clubs had closed and reasoned that they would no longer drain cash from Streamers. Stacy did not request more recent data or conduct an independent investigation into the financial health of the corporations or guarantors.
 
 
 8
 Stacy signed a contract in Detroit on October 9, 1987, with Fraser and Koehler, only after requesting that Fraser and Koehler personally guarantee the agreement, which they did. Stacy invested $500,000 with the understanding that from $250,000 to $275,000 would be used for actual reconcepting, including new furniture, fixtures, outside renovations, and other improvements. The balance of the $500,000 invested was to be used for rent and other accounts payable and to insure that Fizz would have adequate cash to maintain good credit with vendors.
 
 
 9
 In accordance with Richard Fraser's instructions, Stacy wired $400,000--in three installments--to defendants' bank accounts, and Stacy's friend, Robert Henderson, wired $100,000 from Ohio to a bank account in Atlanta, Georgia, maintained by "R.A. Fraser." Stacy later refunded to Henderson the $100,000 that Henderson had invested along with the anticipated profits that he should have received from that investment. Thus, Stacy succeeded to Henderson's rights. The account to which Henderson wired the final $100,000 payment was not Richard Fraser's alone, but was the joint account of Richard Fraser and his spouse, Barbara Fraser. According to Stacy, Fraser did not permit the FKS of Detroit accountant to establish a separate account for Stacy's investment funds to be used for reconcepting. Instead, all the funds from the operations in Detroit, Columbus, and Toledo were commingled in one account. Some of these funds were used for the Frasers' personal expenses and for Fraser and Koehler's other business operations. Although Koehler had agreed not to take any remunerations from Fizz, he did draw a salary after entering the agreement, as reported on a statement for the three months ending March 27, 1988.
 
 
 10
 Koehler later wrote to Stacy that the "payable situations" greatly diminished the defendants' opportunity to do the full reconcepting that they had hoped to do in order to get the market response sought. Nevertheless, the reconcepted club generated over $200,000 in gross revenues during the first two months of its operation. In 1988, the St. Louis club, Menage, had gross revenues of over $1,400,000. Despite these revenues, Fraser and Koehler sent a series of letters to Stacy informing him that payments were suspended and inviting him to invest in other clubs that Fraser and Koehler planned to open. A letter signed by Fraser, dated December 30, 1987, informed Stacy that his 8% payments were suspended until at least 1989, at which point they would "re-evaluate." The letter offered Stacy an additional 1% in Menage and other opportunities. Over the next several years, Stacy continued to receive communications offering investment opportunities in other facilities. He did not, however, receive any money from the defendants. The Streamers/Fizz club was closed in May 1988, and Stacy sued the defendants on theories of fraudulent inducement and fraudulent conveyance.
 
 II.
 
 11
 During his case in chief, plaintiff introduced three categories of evidence intended, according to plaintiff, to prove the elements of fraudulent inducement and fraudulent conveyance. The district court thought the evidence was admissible as "other acts" testimony under Rule 404(b) and so ruled, over defendants' objection:
 
 
 12
 THE COURT: Excuse me, Mr. Poast. I understand the issue. The issue the plaintiff is representing to the jury is whether he was fraudulently induced to go into that Detroit deal by certain representations and activities of your clients and that your clients, of course, deny it. He claims that they occurred. And to prove they probably occurred, to show the denials of your clients are probably not in good faith or not true is that they did similar things with others, which shows, as it says here, absence of mistake or accident or to show plan, preparation and so forth. And I think that's appropriate testimony. Whether the event took place before after the particular event that this lawsuit's about--
 
 
 13
 ....
 
 
 14
 MR. BROWN: We have never gotten a clear clarification as to which portion of 404(b) the plaintiff is relying. They said one of these.
 
 
 15
 THE COURT: I just strung them all together. It said: 'It may, however, be admissible such as proof of moti'--can be proof of motive; this is a scam that these guys were running--'... opportunity, intent.' They were--this was not the only event, and there were subsequent events to confirm what probably happened in the beginning, the first time, was true. '... preparation, plan.' There was a plan. '... knowledge, identity or absence of mistake or accident.' Does that answer your question?
 
 
 16
 MR. BROWN: It does.
 
 
 17
 THE COURT: Okay.
 
 
 18
 MR. BROWN: My next comment is, there is no allegation of any sort of conspiracy in their complaint. It is merely fraud in the inducement.
 
 
 19
 THE COURT: Well--
 
 
 20
 MR. BROWN: And there have been no allegations in the complaint where there has been a plan....
 
 
 21
 Thus, it appears that the district court, rather than plaintiff's counsel, introduced the 404(b) rationale as a basis for admitting the "other acts" evidence. We need not resort to 404(b) to find the challenged evidence admissible. It is admissible because it is relevant to Stacy's claims of fraudulent inducement to contract and fraudulent conveyance.
 
 A.
 
 22
 The first of the challenged evidence is the testimony of Carlo DiMaria and certain financial statements submitted to Heritage Bank by Richard Fraser. To finance the Menage project in St. Louis, the defendants borrowed money from Heritage National Bank in St. Louis. Neither Fraser nor Koehler advised Heritage Bank, either orally or in the required financial statements, that 1% of Menage's gross revenues had been pledged to Stacy. Carlo DiMaria, who served as vice president of Heritage Bank but was not employed by that bank until February 1990, well after the challenged transactions occurred, was involved in the collection of a judgment lien against Menage Partners, L.P., and its guarantors, William and Susan Koehler, and Richard and Barbara Fraser. DiMaria gave his opinion, without objection from defense counsel, that, on many occasions, Richard Fraser had not been truthful to him about financial matters. DiMaria testified, over the objections of defense counsel, that personal financial statements submitted by Richard Fraser to Heritage Bank to induce Heritage Bank to make a loan to Menage Partners improperly failed to include the Frasers' obligations to their children or report any obligation owed to Stacy. William Koehler submitted personal financial statements to Heritage Bank that also failed to indicate any obligation to Stacy and that reported an increasing personal worth from 1988-1990. The December 31, 1988, Menage Partners' financial statement that was prepared as part of a request for a commitment letter, and that failed to report Stacy's 1% share of Menage, was admitted into evidence.
 
 
 23
 The financial statements, which DiMaria testified were inaccurate reflections of defendants' personal and corporate financial status, are some evidence that Fraser and Koehler may never have had any intention of honoring their obligations to Stacy because the statements, prepared shortly after the execution of the contract with Stacy, failed to acknowledge that debt. Further, the Frasers' personal financial statements are relevant to the issue of their solvency. Koehler's increasing personal net worth during the time when Stacy was receiving no money tends to prove that Koehler never intended to fulfill his personal guarantee to Stacy. Finally, the Menage Partners' statement was relevant to determining the amount of money Stacy should have been paid from his 1% share in Menage.
 
 B.
 
 24
 The second category of challenged evidence is the opinion testimony of W. Wallace Lanahan, III, and a letter sent to Stacy by Fraser, which bore Lanahan's signature. Lanahan testified that the letter was a fabrication, not in fact written by Lanahan, and actually was two separate documents that had been "fused together." The letter expressed great confidence in Fraser's and Koehler's professional competence, and, according to Lanahan, contained representations Lanahan would never have made.
 
 
 25
 The fabricated letter sent to Stacy, ostensibly over banker Lanahan's signature, which expressed confidence in Fraser and Koehler's financial endeavors, is evidence that Fraser and Koehler intentionally and dishonestly misrepresented the financial health of Streamers to induce Stacy to invest even more money with the defendants and to falsely assure Stacy that his prospects for being repaid were good. The subject matter of the letter and Lanahan's testimony concerning it are directly relevant to the ongoing dealings between the parties and, thus, their admissibility need not be evaluated under the far more problematic "other acts" analyses.
 
 C.
 
 26
 The third category of challenged evidence is certain testimony by Barbara Fraser. Stacy claimed that Richard Fraser fraudulently conveyed $100,000 to Barbara Fraser when Richard Fraser requested that the last $100,000 of Stacy's $500,000 investment be sent by wire transfer to Richard Fraser's bank account, which was actually a joint account for Richard and Barbara Fraser. In May 1988, Barbara Fraser wrote two checks, each for $75,000, on the joint account. These checks were made out to the Fraser children and deposited in their custodial accounts. The Frasers argue that there was no fraudulent conveyance because they transferred the money to repay a just debt. Shortly after the transfers to the custodial accounts, however, the defendants again began writing checks on those accounts for their personal expenses.
 
 
 27
 Over the objections of defense counsel, the plaintiff elicited testimony from Barbara Fraser concerning checks that were drawn on the children's custodial bank accounts from the middle of 1988 through December of 1988, which clearly postdated the alleged fraudulent conveyance of $100,000 to Barbara Fraser through the joint account. At sidebar, Stacy's counsel stated: "It demonstrates the money was placed back in the children's account for only a brief, temporary, and pretextual reason whereupon the accounts were once again looted."
 
 
 28
 Barbara Fraser's testimony that she used money from her children's bank account was properly admitted. The fact that the money was quickly withdrawn to pay personal expenses undermines her testimony that the Frasers deposited the money to repay a "just debt" rather than to defraud creditors. Further, the ultimate disposition of the funds is relevant to plaintiff's claim that Fraser never intended to use Stacy's money for the reconcepting, as promised. Additionally, Barbara Fraser's testimony that they had to use custodial account money for living expenses because they were struggling financially bears on the issue of their solvency and tends to disprove Richard Fraser's representation to Stacy, supported by financial statements, that the Frasers' net worth was in excess of $3 million.
 
 
 29
 Barbara Fraser's testimony is directly relevant and was properly admitted.
 
 III.
 A.
 
 30
 To support their argument that the district court erred in denying their motions for judgment as a matter of law and for a new trial, defendants argue that Stacy failed to prove, by clear and convincing evidence, two essential elements of fraudulent inducement: 1) that the information that was submitted to him by the defendants, and that he reviewed in deciding to enter into the subject transaction, was false, and 2) that he relied upon any false information in deciding to invest in the transaction. Defendants also argue that Stacy failed to meet his burden of proving that Richard Fraser was insolvent at the time of the transfer, and that Richard Fraser, in fact, conveyed $100,000 to Barbara Fraser. Further, they argue that the Frasers met their burden of showing that the transfer was legitimate and was not made to defraud Stacy.
 
 
 31
 The standard that governs this court's review of both the district court's denial of a Rule 50(a) motion for judgment as a matter of law and of a Rule 50(b) renewal motion is as follows:
 
 
 32
 In determining whether the evidence is sufficient to support a jury verdict, the evidence, and the reasonable inferences drawn therefrom, must be viewed in the light most favorable to the non-moving party. The court must not consider the credibility of witnesses nor weigh the evidence because to do so would "substitute the court's opinion for that of the jury." In addition ... a court may not set aside the jury verdict merely because the opposite conclusion could have been reached or because different inferences could have been drawn. Rather, the court must determine whether any reasonable jury could have reached the verdict based on the evidence presented at trial.
 
 
 33
 McNaughton v. United States, 888 F.2d 418, 421 (6th Cir.1989) (citations omitted).
 
 
 34
 Under Michigan law, affirmative misrepresentations are not a prerequisite to proof of fraud; where there is a duty of disclosure, suppressing facts may constitute fraud. See Hand v. Dayton-Hudson, 775 F.2d 757, 759 (6th Cir.1985) (citations omitted). Michigan law imposes "an equitable duty of disclosure in a business transaction when 'circumstances surrounding a particular transaction are such as to require the giving of information....' " Hand, 775 F.2d at 759 (citing Ainscough v. O'Shaughnessey, 78 N.W.2d 209 (Mich.1956)). There was a duty of disclosure here where the defendants presented the plaintiff with outdated financial information, invited him to accept that information as current, and neglected to mention that Streamers had experienced a severe drop in revenues since that information was prepared.
 
 
 35
 Reasonable jurors could believe that Stacy relied upon the 1986 tax return as an accurate representation of Streamers' financial health at the time of the negotiations over the deal, and that, in signing the personally guaranteed contract, he relied upon Fraser's representation that Fraser was worth $3 million. There was ample evidence from which the jury could have concluded that Fraser substantially misrepresented his personal net worth.
 
 
 36
 Further, the jury could have concluded that at the time the contract was executed in Michigan, Fraser did not intend to pay Stacy any of the money promised. Stacy was never paid any money, even though the reconcepted club immediately generated revenues and the club Menage generated substantial revenues. Fraser and Koehler sent a series of letters, soon after execution of the contract, offering Stacy investments in lieu of the payments to which Stacy was entitled under his contract. Fraser and Koehler's financial statements did not list the personally guaranteed debt to Stacy, and Fraser and Koehler did not report Stacy's 1% interest in Menage to Heritage Bank.
 
 
 37
 Finally, the jury could have concluded that Fraser and Koehler never intended to use Stacy's funds to reconcept Streamers as promised. For example, there was testimony that the accountant was not permitted to establish a separate account for Stacy's investment funds to be used for reconcepting. Use of Stacy's funds for Koehler's salary, for Fraser's personal expenses, and for the operation of other clubs also may have indicated to the jury that Fraser never intended to use Stacy's investment for reconcepting.
 
 
 38
 There was evidence to support the jury's verdict on the claims of fraudulent conveyance as well. Testimony indicated that the Frasers were insolvent at the time of the conveyance; Barbara Fraser testified that they were struggling, that their financial situation was poor, and that they needed their children's money to pay living expenses. Further, Koehler's December 13, 1988, letter sent to Stacy by Fraser stated that Fraser and Koehler "flirted with personal bankruptcy on a daily basis."
 
 
 39
 This court may reverse the trial court's decision to grant or deny a new trial under Rule 59 only if the trial court abused its discretion. Davis v. Jellico Community Hosp., Inc., 912 F.2d 129, 132 (6th Cir.1990). Abuse of discretion is present only if this court has "a definite and firm conviction that the trial judge committed a clear error in judgment." Logan v. Dayton Hudson Corp., 865 F.2d 789, 790 (6th Cir.1989). We have no such conviction.
 
 B.
 
 40
 Finally, the plaintiff appeals the court's judgment as a matter of law for defendant Koehler. We apply the same standard as is applied by the district court in determining whether judgment as a matter of law was appropriate. Sawchik v. E.I. DuPont Denemours & Co., 783 F.2d 635, 636 (6th Cir.1986).
 
 
 41
 A motion for directed verdict under Rule 50(a) may not be granted if sufficient evidence was presented to raise a material issue of fact for the jury. Nida v. Plant Protection Ass'n Nat'l, 7 F.3d 522, 525 (6th Cir.1993) (citation omitted). In making this determination, the court must draw all inferences in favor of the nonmoving party and grant the motion only if there is a complete absence of proof on the issues or no controverted issues of fact about which reasonable minds could differ. Nida, 7 F.3d at 525 (citations omitted).
 
 
 42
 Plaintiff raises the question as to whether the court should have applied the substantive law of Michigan or of Ohio in deciding whether to submit the case against Koehler to the jury. We find that the court below correctly followed Ohio's choice of law rules and correctly concluded that the law of Michigan applies. Ohio's choice of law rules direct us to the RESTATEMENT (SECOND) CONFLICT OF LAWS, section 148(2). Although there is evidence that the defendants fraudulently concealed material information in both Michigan and Ohio and that plaintiff relied on the concealments in both states, three important contacts occurred in Michigan. Michigan is the situs of the subject of the transaction because Streamers was located in Michigan; the contract was personally guaranteed and executed in Michigan; and the plaintiff rendered performance in Michigan by wiring payments to defendants' Michigan bank accounts.
 
 
 43
 The district court gave no reason for its determination that Koehler was entitled to judgment as a matter of law, and we can think of none. Even applying Michigan's standard of clear and convincing evidence for proof of fraud, there is a jury submissible issue as to whether Koehler fraudulently induced Stacy to invest in Streamers. In the first place, Koehler and Richard Fraser acted jointly, so there is as much evidence against Koehler as against Fraser. There is evidence that Koehler concealed information material to Stacy's investment decision by inviting him to rely on outdated and misleading information, and that Koehler falsely represented his intent to use the money invested by Stacy to reconcept Streamers as the contract provided and to forego his management fees or other salary. The case against Koehler should have been submitted to the jury.
 
 IV.
 
 44
 We AFFIRM the judgment for Stacy, REVERSE the judgment for Koehler, and REMAND for a new trial as to Koehler only.